**INDEX OF EXHIBITS**

1. International Customized Mail Service Agreement.

2. Letter dated March 21, 2005 from William J. Olson, Esquire mailed to Michael K. Plunkett.

3. Judgment from the Circuit Court of Baltimore City against American Mail Sort and Robert Dunbebin.

4. Plaintiff's Claim for Damages, Injury or Death on Standard Form 95 filed with Defendant.

5. Letter dated September 26, 2006 from Wendy Wiedemann Hudson, Attorney for Defendant denying Plaintiff's Claim for Damages.

6. List of corporations who would be directly irreparably harmed if the International Licence is terminated.

7. James Sturgill, C.P.A's draft report.

# Exhibit 1

# International Customized Mail Service Agreement

ORIGINAL

# *INTERNATIONAL CUSTOMIZED MAIL SERVICE AGREEMENT BETWEEN THE UNITED STATES POSTAL SERVICE AND DISTRIBUTION POSTAL, INC.*

This Agreement is between the United States Postal Service, an independent establishment of the United States government, and Distribution Postal, Inc. with offices at 6200 Frankford Ave., Baltimore, MD 21206-4902.

## ARTICLE 1. PURPOSE OF THE AGREEMENT

This Agreement shall govern the use Distribution Postal, Inc. shall have of International Customized Mail service for International Priority Airmail, International Surface Air Lift, and Global Bulk Economy.

## ARTICLE 2. DEFINITIONS

As used in this Agreement:

1. "United States" means the United States of America, its territories and possessions.
2. "USPS" means the United States Postal Service.
3. "Mailer" means Distribution Postal, Inc. with offices at 6200 Frankford Ave., Baltimore MD 21206-4902, its subsidiaries and agents.
4. "DMM" means the *Domestic Mail Manual* as published by the USPS from time to time.
5. "IMM" means the *International Mail Manual* as published by the USPS from time to time.
6. "ICM" means International Customized Mail, the bulk mailing system created by this Agreement, pursuant to which the USPS shall accept mail from the Mailer for international delivery.
7. "ICM Mail" means mail the Mailer tenders to the USPS pursuant to this Agreement.
8. "IPA" means International Priority Airmail Service as described in IMM 292.
9. "ISAL" means International Surface Air Lift Service as described in IMM 293.
10. "GBE" means Global Bulk Economy.
11. "ISC" means an International Service Center.
12. "Qualifying Mail" means ICM Mail that meets the requirements set forth in Article 3 of this Agreement.
13. "Non-Qualifying Mail" means ICM Mail that does not meet the requirements set forth in Article 3 of this Agreement.

ORIGINAL

**ARTICLE 3. QUALIFYING MAIL**

Only mail that meets the following requirements shall qualify as ICM Qualifying Mail except as those requirements conflict with the applicable specific requirements set forth in this Agreement.

1. IPA. Every item must comply with the preparation requirements set forth in IMM 292 for International Priority Airmail Service.
2. ISAL. Every item must comply with the preparation requirements set forth in IMM 293 for International Surface Air Lift Service.
3. Global Bulk Economy. Every item must comply with the Specific Preparation and Payment Requirements set forth in Annex One.

**ARTICLE 4. NON-QUALIFYING MAIL**

The USPS, at its option and without forfeiting any of its rights under this Agreement, may either refuse to accept Non-Qualifying Mail or accept Non-Qualifying Mail under terms and conditions and at postage rates to be specified by the USPS.

**ARTICLE 5. OBLIGATIONS OF THE USPS**

The USPS hereby agrees:

1. Supplies. To furnish the Mailer with the postal equipment and postal supplies required for the use of Qualifying Mail.
2. On-site Training. To provide the Mailer with the preparation requirements for Qualifying Mail and any training necessary to prepare ICM Mail in conformity with the requirements for Qualifying Mail.
3. Transportation. To arrange with carriers to transport Qualifying Mail to international destinations for delivery by the appropriate authority.

**ARTICLE 6. OBLIGATIONS OF THE MAILER**

The Mailer hereby agrees:

1. Tender Amount. To tender to the USPS international mail intended for delivery outside the United States that generates at least $25 million in actual postage in each year beginning on the effective date of this Agreement, as defined in Article 12, and ending on each anniversary of that date for the duration of the Agreement.
2. Tender Locations. To tender:
   a. At least ninety-nine (99) percent of IPA Qualifying Mail in drop shipments to the appropriate locations specified in IMM 292.153.
   b. At least ninety-nine (99) percent of ISAL Qualifying Mail in drop shipments to the appropriate locations specified in IMM 293.32.
   c. No more than one (1) percent of IPA and ISAL Qualifying Mail to other postal facilities at the national rate or full service rate as appropriate.

ORIGINAL

d. GBE must be drop-shipped at the USPS facility at New Jersey International and Bulk Mail Center (NJI&BMC), 80 County Road, Jersey City, NJ 07097-9998, or to the Oakland International Service Facility (OISF), 500 85th Avenue, Oakland, CA 94622.

3. Advance Notification. To provide:

a. The Manager, International Customized Mail, via fax to (703) 292-3767 or email to icmusps@email.usps.gov, with notification of intent to drop ship mail at a specific ISC two weeks before the initial shipment to that ISC.

b. The Manager, International Customized Mail, via fax to (703) 292-3767 or email to icmusps@email.usps.gov, with notification of new dedicated permit numbers, two weeks in advance of using the new dedicated permit numbers.

c. The appropriate USPS acceptance sites with projections of mailings to include the intended date of mailing, weight, and volume of the mailings.

4. Payment of Postage.

a. To pay postage to the USPS, either directly or through a mailing agent, for all ICM Qualifying Mail by use of dedicated permit imprints subject to the conditions stated in DMM P040.

b. To pay postage to the USPS for GBE using an exclusive permit number.

5. Cancellation: Mailer or the USPS may cancel this Agreement by giving the other party six (6) months notice in writing. If this Agreement is cancelled, upon termination, Mailer will receive the published discount for Qualifying Mail in accordance with the IMM.

## ARTICLE 7. POSTAGE RATES

1. ISAL and IPA:

a. In consideration of Article 6, Paragraph 1, the Mailer will receive a sixteen percent (16.0%) discount off non-discounted published rates in effect on the date of mailing for IPA and ISAL Qualifying Mail.

b. In the event that USPS costs for Qualifying Mail increase in excess of five percent (5.0%), the USPS shall notify the Mailer and renegotiate the rates established under this Agreement.

2. Global Bulk Economy. In consideration of Article 6, Paragraph 1, the Mailer will receive a sixteen (16.0%) percent discount off the base rates located in Annex One for GBE Qualifying Mail.

ORIGINAL

**ARTICLE 8. GUARANTEE**
If the Mailer does not tender to the USPS international mail intended for delivery outside the United States that generates at least $25 million in actual postage on an annualized basis, the Mailer must reimburse the USPS the amount of the additional discount it received for IPA and ISAL above the discount earned subject to this Agreement in accordance with Exhibit 1. Payment must be made no later than three (3) months after the end of the related period.

**Exhibit 1**

| Annual IPA, ISAL, and GBE Revenue * | Percentage Discount |
|---|---|
| $ 2,000,000 - $ 4,999,999 | 5.00% |
| $ 5,000,000 - $ 5,999,999 | 10.00% |
| $ 6,000,000 - $ 6,999,999 | 11.00% |
| $ 7,000,000 - $ 7,999,999 | 12.00% |
| $ 8,000,000 - $ 8,999,999 | 13.00% |
| $ 9,000,000 - $ 9,999,999 | 14.00% |
| $10,000,000 - $14,999,999 | 15.25% |
| $15,000,000 - $19,999,999 | 15.50% |
| $20,000,000 - $24,999,999 | 15.75% |
| $25,000,000 and over | 16.00% |

* Actual revenue received after discount is applied.

**ARTICLE 9. NO SERVICE GUARANTEE**
Nothing in this Agreement shall be construed as a representation or guarantee by the USPS that Qualifying Mail will be delivered to the appropriate addressees within any particular time.

**ARTICLE 10. SUSPENSIONS OF MAIL SERVICE**
In the event that a suspension of mail service from the United States to a given country would prevent delivery of Qualifying Mail to addressees in that country, the Mailer shall not tender Qualifying Mail to the USPS until service is restored. Under these circumstances, the Mailer shall have the option to make alternative arrangements for the delivery of Qualifying Mail without penalty.

**ARTICLE 11. LIMITATION OF LIABILITY**
The liability of the USPS under this Agreement shall be limited to the refund of postage for Qualifying Mail that is lost or destroyed in bulk after being tendered to the USPS and prior to being received by the delivery authority outside of the United States. The USPS shall not be liable for any actual or consequential damages suffered by the Mailer as the result of late delivery or non-delivery of Qualifying Mail.

**ARTICLE 12. TERM OF THE AGREEMENT**
This Agreement shall be in effect from April 26, 2002, and shall remain in effect until midnight on April 30, 2005.

ORIGINAL

ARTICLE 13. INDEMNITY

The Mailer shall indemnify and save harmless the USPS and its officers, agents, and employees from any and all claims, losses, costs, damages, or expenses growing out of, or connected in any other way with the discharge by the Mailer of any undertaking contained in this Agreement, except for Claims arising out of the negligence or willful misconduct of the USPS or of its officers, agents, or employees. Notwithstanding its obligation to indemnify the USPS, the Mailer shall not be liable for any consequential damages suffered by the USPS.

ARTICLE 14. FORCE MAJEURE

Neither party shall be liable for its failure to perform under the terms of this Agreement due to any contingency beyond its reasonable control, including acts of God, fires, floods, wars, sabotage, accidents, labor disputes or shortages, governmental laws, ordinances, rules and regulations, whether valid or invalid, court orders, whether valid or invalid, inability to obtain material, equipment, or transportation, and any other similar or different contingency.

ARTICLE 15. NO WAIVER

The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but these shall continue and remain in full force and effect as if such forbearance or waiver had not occurred.

ARTICLE 16. GOVERNING LAW

This Agreement shall be governed by, construed, and enforced in accordance with United States federal law.

ARTICLE 17. EFFECT OF PARTIAL INVALIDITY

The invalidity of any portion of this Agreement will not and shall not be deemed to affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be deemed to be in full force and effect.

ARTICLE 18. ENTIRE AGREEMENT

This Agreement shall constitute the entire agreement between the parties regarding the use of the ICM Program as it pertains to Qualifying Mail intended for delivery outside the United States. Any prior understanding or representation of any kind preceding the date of this Agreement regarding the use of the ICM Program for Qualifying Mail originating in the United States and intended for delivery outside the United States shall not be binding upon either party except to the extent incorporated in this Agreement.

ARTICLE 19. MODIFICATION

Any modification of or Amendment to this Agreement or additional obligation assumed by either party in connection with this Agreement shall be binding only if placed in writing and signed by each party.

ORIGINAL

ARTICLE 20. ASSIGNMENT
The rights of each party under this Agreement are personal to that party and may not be assigned or transferred to any other person, firm, corporation, or other entity without the prior, express, and written consent of the other party. Granting such consent shall not be unreasonably withheld and shall be allowed for assignment to a subsidiary or affiliate of the Mailer.

ARTICLE 21. NUMBER AND GENDER
The use of any particular gender or the plural or singular number in this Agreement is intended to include the other gender or number as the text may require.

ARTICLE 22. PARAGRAPH HEADINGS
The titles to the paragraphs of this Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Agreement.

ARTICLE 23. NOTICES
All notices or demands required by this Agreement shall be sufficient if delivered personally or mailed to the following individuals:

**To the United States Postal Service:**

United States Postal Service
Vice President, International Business
1735 N. Lynn St. Rm 6026
Arlington, VA 22209-6002

**To the Mailer:**

Distribution Postal
7914 E Baltimore St
Baltimore Md 21224

ORIGINAL

In witness whereof, each party to this Agreement has caused it to be executed as indicated below.

**ON BEHALF OF THE UNITED STATES POSTAL SERVICE:**

Signature: [signature]

Name: John Alepa

Title: Manager, International Pricing/Cost Analysis

Date: 4/24/02

**ON BEHALF OF DISTRIBUTION POSTAL, INC.:**

Signature: [signature]

Name: Robert Dunkelbin

Title: VP

Date: 4/24/02

ORIGINAL

# ANNEX ONE

## GLOBAL BULK ECONOMY (GBE) SERVICE
## MAIL PREPARATION
## (REVISED 2/4/02)

### Definition

Global Bulk Economy (GBE) service provides lower cost International delivery of letter-post items. Mailings are entered by the mailer at either New Jersey International and Bulk Mail Center (NJIBMC) or Oakland International Service Facility (OISF), then dispatched by the Postal Service via surface transportation to destination countries.

Mailers are provided with dispatch schedule information to each destination country and the corresponding critical entry day/time by which a mailing must be entered. Once the mailing is entered, the Postal Service will make its best effort to include it in the next scheduled dispatch.

### Qualifying Mail and Minimum Quantity Requirements

Letter-post mail as defined in IMM 241 that meets all applicable mailing standards may be sent in this service. Items do not have to be of the same size and weight to qualify. There is a minimum volume requirement of 100 pounds per mailing. Mail must be prepared in direct country sacks. The minimum weight per sack is 11 pounds.

### Availability

GBE service is available from New Jersey International and Bulk Mail Center (NJIBMC) to the countries listed in Exhibit A and from Oakland International Service Facility (OISF) to the countries listed in Exhibit B.

### Deposit

The mailer must tender the mail at one of the following locations:

New Jersey International and Bulk Mail Center
80 County Road
Jersey City, NJ 07097-9998

Oakland International Service Facility
500 85th Avenue
Oakland, CA 94622

The mailer must establish an advance deposit account or obtain a postage meter license issued by the Oakland, CA Post Office for mailings entered at OISF, and/or by the Newark, NJ Post Office for mailings entered at NJIBMC. As an alternative, mailers who are participating in a PVDS program (see DMM P750) may have the mail verified, accepted, and paid for at the mailer's plant or at the origin post office serving the mailer's plant if authorized under DMM P 750.2.2. Plant-verified drop shipment mail must be transported by the mailer to the drop shipment location, accompanied by PS Form 8125, *Drop Shipment Clearance Document*.

ORIGINAL

Postage

The following are base rates from which percentage volume discounts are applied. The GBE percentage volume discount is equal to the ISAL/IPA percentage volume discount for which the mailer qualifies, as specified in the ICM Agreement.

The per-piece rate applies to each piece regardless of its weight. The per-pound rate applies to the net weight (gross weight minus tare weight of mailing equipment) of the mail for the specific rate group. Fractions of a pound are rounded to the next whole pound for postage calculation.

**Global Bulk Economy Base Rates**

| Rate Group | Per-Piece | + | Per-Lb. |
|---|---|---|---|
| 1 (Western Europe) | $0.20 | + | $2.04 |
| 2 (Japan, Australia, New Zealand) | $0.20 | + | $2.16 |
| 3 (Rest of World) | $0.12 | + | $3.36 |

The United States Postal Service reserves the right to change the Global Bulk Economy Base Rates subject to a sixty (60) day notification to the Mailer.

**Separation by Rate Group**

When presenting a mailing to the Postal Service, the mailer must physically separate the sacks and/or pallets by rate group (i.e. 1, 2, 3) and specify the rate group on the back of PS Tag 181 for country sacks and/or on the front of country pallet placards (when applicable).

**Computation of Postage**

Postage is calculated by multiplying the number of pieces in the mailing by the applicable per-piece base rate, multiplying the net weight (in whole pounds) of the entire mailing by the applicable per-pound base rate, and then adding the two totals together.

**Postage Payment Methods**

GBE is subject to a per-piece rate plus a per-pound rate. Postage must be paid by postage meter, permit imprint, mailer pre-canceled stamp or a combination thereof. For non-identical pieces, the applicable per-piece postage must be affixed to each piece by meter or mailer pre-canceled stamp. For identical weight pieces, each piece may bear a permit imprint or postage meter postage for the per-piece rate portion. Postage for the per-pound rate portion may be paid from an advance deposit account or meter postage attached to the postage statement.

When postage is paid from an advance deposit account, any of the permit imprints shown in IMM Exhibit 152.3 for letter-post are acceptable. As an alternative to these formats, the following optional formats may be used:

ORIGINAL

GLOBAL BULK ECONOMY
U.S. POSTAGE PAID
JERSEY CITY, NJ 07097
PERMIT NO. XXX

GLOBAL BULK ECONOMY
U.S. POSTAGE PAID
OAKLAND, CA 94622
PERMIT NO. XXX

Note: Mailers may use permit imprint with non-identical weight pieces if authorized to use postage mailing systems under DMM P910, P920, or P930.

**Weight and Size Limits**

**A. Weight**

The weight limit for regular letter-post items is 4 pounds. The weight limit for letter-post items containing books is 11 pounds.

**B. Size**

1. Envelopes and Packages
   a. Minimum length and height: 5-1/2 X 3-1/2 inches
   b. Minimum depth: .007 inch
   c. Maximum length: 24 inches
   d. Maximum length, height, depth (thickness) combined: 36 inches

2. Rolls
   a. Minimum length: 4 inches
   b. Minimum length plus twice the diameter combined: 6-3/4 inches
   c. Maximum length: 36 inches
   d. Maximum length plus twice the diameter combined: 42 inches

ORIGINAL

Preparation Requirements

A. Addressing

Global Bulk Economy is subject to the addressing requirements contained in IMM 122.

**Exception:** Global Bulk Economy is not subject to the interline addressing requirement that is specified in IMM 122.1d. At the sender's risk, the English translation of the destination post office or city name may be omitted from printed addresses that are in Russian, Greek, Arabic, Hebrew, Cyrillic, Japanese, or Chinese characters. An English translation of the country name (e.g. Japan) is still required on the individual mail pieces.

**B. Marking and Packaging**

Global Bulk Economy is subject to the marking and packaging requirements contained in IMM 244.

**C. Makeup**

- All mail must be prepared in packages (bundles) within sacks. Packages must contain at least 10 items.
- Packages of letter-size mail items must be no thicker than approximately a handful of mail (4 to 6 inches). Packages of flat-size mail items may be thicker than 6 inches but must not weigh more than 11 pounds.
- All items in a package must be "faced" in the same direction (i.e. arranged so that the addresses read in the same direction, with an address visible on the top piece).
- Items that cannot be bundled because of their physical characteristics (i.e. tubes) may be placed loose in the sack.
- Each package must be securely tied. Placing rubber bands around the length and then the girth is the preferred method of securing packages of letter-size mail. Plastic strapping placed around the length and then the girth is the preferred method of securing packages of flat-size mail.

**D. Sacking and Labeling**

Packages of mail must be prepared into direct country sacks. The minimum weight per sack is 11 pounds. The maximum weight per sack is 66 pounds. Gray plastic sacks must be used. PS Tag 181, available from OISF and NJIBMC, must be affixed to each sack and completed as follows:

**Front of Tag:**

To: Enter the three-letter code of the destination exchange office and the country name.
Date: Enter the same date that appears on the Statement of Mailing.
Kg: Enter the combined weight of the sack and its contents in kilograms.

The other blocks on the tag are reserved for USPS use and must remain blank.

**Back of Tag:**

Enter the appropriate country rate group.

ORIGINAL

Example (front of tag):

| | |
|---|---|
| From: | To: |
| Mail No: | KWS<br>JAPAN |
| Date: APRIL 1, 2002 | |
| Receptacle No.: | Via: |
| Class: | |
| Kg: 27.2 | |

Note: Destination exchange office codes and country rate groups are listed in Exhibit A.

E. **Palletizing (optional)**

To expedite handling, country pallets may be optionally prepared when there is a minimum of 250 pounds of mail to one country. If this option is used, the mailer must first prepare direct country sacks as described above. Direct country sacks must then be placed within pallet boxes (often referred to as Gaylords) and placed on pallets. Pallets must be capped, shrink-wrapped and banded to insure their integrity during transit. A pallet label (placard) must be placed on all four sides. The pallet label (placard) formats appear below.

The following guidelines must be used when preparing pallets:

- Minimum height: 20 inches
- Maximum height: 57 inches
- Minimum weight: 250 pounds
- Maximum weight: 2, 205 pounds (1,000 kg.)

Note: The Postal Service provides pallets free of charge for use with GBE mailings. They are available at NJI&BMC and OISF.

ORIGINAL

# U.S. MAIL

*TO:* ______________________________

**FROM: NJI & BMC**
**JERSEY CITY NJ 07097**

**CONTENTS:**
**GLOBAL BULK ECONOMY**

**PALLET WT. (KG)** ____________

**DATE:** ______________________

**RATE GROUP:** ______________

ORIGINAL

# U.S. MAIL

*TO:* ______________________________

**FROM: OAKLAND INTL**
**SERVICE FACILITY**
**OAKLAND CA 94622**

**CONTENTS:**
**GLOBAL BULK ECONOMY**

**PALLET WT. (KG)**__________

**DATE:**____________________

**RATE GROUP:** ____________

# U.S. MAIL

ORIGINAL

# EXHIBIT A
# GLOBAL BULK ECONOMY (GBE) COUNTRY LIST (REVISED 9/5/01)

## NEW JERSEY INTERNATIONAL AND BULK MAIL CENTER (NJI&BMC)

Note: Cutoff is 10AM of business day prior to dispatch day.

NJI&BMC

| COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | SAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| ALBANIA | TIA | | Weekly - M | 21 | 3 |
| ALGERIA | ALG | | Weekly - W | 28 | 3 |
| ANGOLA | LOB | | Every 10 days | 17 | 3 |
| ANGUILLA | | Include with Netherlands Antilles (Philipsburg). | | | |
| ANTIGUA and BARBUDA | AAJ | Includes Redonda. | Weekly - Tu | 13 | 3 |
| ARGENTINA | BUE | | Weekly - W | 25 | 3 |
| ARMENIA | EVN | | Weekly - Th | 25 | 3 |
| ARUBA | AUA | | Weekly - F | 15 | 3 |
| ASCENSION ISLANDS | | Include with Great Britain. | | | |
| AUSTRALIA | SYD | | Weekly - Th | 32 | 2 |
| AUSTRIA | SZG | | Weekly - Th | 18 | 1 |
| AZERBAIJAN | BAK | | Weekly - Tu | 25 | 3 |
| AZORES | | Include with Portugal. | | | |
| BAHAMAS | NAS | | Weekly - Th | 12 | 3 |
| BAHRAIN | AAM | | Biweekly - Tu | 30 | 3 |
| BALEARIC ISLANDS | | Include with Spain. | | | |
| BANGLADESH | CGP | | Weekly - F | 38 | 3 |
| BARBADOS | BGI | | Weekly - M | 13 | 3 |
| BELARUS | MSQ | | Weekly - Th | 20 | 3 |
| BELGIUM | ANX | | Weekly - Th | 14 | 1 |
| BELIZE | BZE | | Weekly - Tu | 23 | 3 |
| BENIN | COU | | Weekly - W | 23 | 3 |
| BERMUDA | BDA | | Weekly - Th | 5 | 3 |
| BOLIVIA | LPB | | Weekly - Th | 27 | 3 |
| BONAIRE | | Include with Netherlands Antilles (Willemstad). | | | |
| BOSNIA-HERZEGOVINA | SJJ | | Weekly - W | 17 | 3 |
| BOTSWANA | | Include with South Africa. | | | |
| BRAZIL | RIO | | Weekly - W | 21 | 3 |
| BRUNEI DARUSSALEM | BWN | | Weekly - W | 37 | 3 |
| BULGARIA | SOF | | Weekly - M | 23 | 3 |
| BURKINA FASO | OUA | | Weekly - M | 33 | 3 |
| BURMA (MYANMAR) | RGN | | Weekly - W | 30 | 3 |
| BURUNDI | AGC | | Weekly - M | 34 | 3 |
| CAMBODIA | AGO | | Weekly - Tu | 23 | 3 |

ORIGINAL

NJI&BMC

| COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | SAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| CAMEROON | DLA | | Weekly - W | 26 | 3 |
| CANARY ISLANDS | | Include with Spain | | | |
| CAPE VERDE | VXE | | Weekly-Th | 14 | 3 |
| CAYMAN ISLANDS | GCM | | Weekly - Tu | 15 | 3 |
| CENTRAL AFRICAN REPUBLIC | BGF | | Weekly - W | 25 | 3 |
| CHILE | SCQ | | Weekly - W | 24 | 3 |
| COLOMBIA | BOG | | Weekly - Th | 13 | 3 |
| CONGO, REPUBLIC OF THE (BRAZZAVILLE) | PDN | | Weekly - W | 25 | 3 |
| COOK ISLANDS | RAR | | Weekly - Th | 32 | 3 |
| COSTA RICA | SJD | | Weekly - W | 10 | 3 |
| COTE D'IVOIRE (IVORY COAST) | ABJ | | Weekly - W | 25 | 3 |
| CROATIA | ZAG | | Weekly - M | 14 | 3 |
| CUBA | HAV | | Weekly - W | 20 | 3 |
| CURACAO | | Include with Netherlands Antilles (Willemstad). | | | |
| CYPRUS | | | Weekly - M | 23 | 3 |
| CZECH REPUBLIC | PRG | | Weekly - W | 17 | 3 |
| DENMARK | AAL | | Weekly - Th | 17 | 1 |
| DJIBOUTI | JIB | | Weekly - M | 26 | 3 |
| DOMINICA | DOM | | Weekly - Tu | 16 | 3 |
| DOMINICAN REPUBLIC | SDQ | | Weekly - M | 10 | 3 |
| ECUADOR | GYE | | Weekly - W | 15 | 3 |
| EGYPT | ALY | | Weekly - Th | 23 | 3 |
| EL SALVADOR | SAL | | Weekly - Tu | 15 | 3 |
| EQUATORIAL GUINEA | BSG | | Weekly - M | 15 | 3 |
| ERITREA | MSW | | Weekly - W | 17 | 3 |
| ESTONIA | TLL | | Weekly - Th | 27 | 3 |
| ETHIOPIA | ADD | | Weekly - M | 29 | 3 |
| FALKLAND ISLANDS | | Include with Great Britain. | | | |
| FINLAND | HEL | | Weekly - W | 15 | 1 |
| FRANCE | MRS | | Weekly - W | 20 | 1 |
| FRENCH GUIANA | CAY | | Weekly - Th | 15 | 3 |
| GABON | LBV | | Weekly - W | 27 | 3 |
| GAMBIA | BJL | | Weekly - Th | 17 | 3 |
| GEORGIA | TBS | | Weekly - Th | 25 | 3 |
| GERMANY | HAM | | Weekly - W | 13 | 1 |
| GHANA | ACC | | Weekly - M | 18 | 3 |
| GIBRALTAR | GIB | | Weekly - M | 15 | 1 |
| GREAT BRITAIN & NORTHERN IRELAND: | | | | | |
| England (except London), Wales, Isle of Man, Channel Islands, Jersey Islands, Ascension, Falkland Islands, and Seychelles. | GBR | | Weekly - Sa | 12 | 1 |
| London only. | LON | | Weekly - Sa | 12 | 1 |

ORIGINAL

NJI&BMC

| COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | SAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| GREAT BRITAIN & NORTHERN IRELAND (cont) | | | | | |
| Scotland only. | GLA | | Weekly - Sa | 14 | 1 |
| Northern Ireland only | BFS | | Weekly - Sa | 13 | 1 |
| GREECE | AHN | | Weekly - M | 18 | 1 |
| GREENLAND | | Include with Denmark. | | | |
| GRENADA | SGO | | Weekly - Tu | 17 | 3 |
| GUADELOUPE | PTP | Includes St. Martin and St. Barthelemy. | Weekly - Th | 16 | 3 |
| GUATEMALA | GUA | | Weekly - M | 12 | 3 |
| GUINEA | CKY | | Weekly - W | 25 | 3 |
| GUYANA | GEO | | Biweekly - Th | 12 | 3 |
| HAITI | PAP | | Biweekly - Th | 13 | 3 |
| HONDURAS | TGU | | Weekly - M | 12 | 3 |
| HONG KONG | HKG | | Weekly - M | 32 | 3 |
| HUNGARY | BUD | | Weekly - W | 17 | 3 |
| ICELAND | REK | | Biweekly - Th | 15 | 1 |
| INDIA | BOF | | Weekly - Tu | 35 | 3 |
| IRAN | THR | | Weekly - Th | 35 | 3 |
| IRELAND | AHE | | Weekly - Th | 15 | 1 |
| ISRAEL | HFA | | Weekly - M | 16 | 1 |
| ITALY | GOA | | Weekly - Th | 18 | 1 |
| JAMAICA | KIN | | Weekly - W | 8 | 3 |
| JAPAN | KWS | | Weekly - Th | 23 | 2 |
| JORDAN | AMM | | Weekly - Th | 32 | 3 |
| KAMPUCHEA | | See Cambodia. | | | |
| KAZAKHSTAN | ALA | | Weekly - Th | 26 | 3 |
| KENYA | MBA | | Weekly - Th | 39 | 3 |
| KOREA, REPUBLIC OF (SOUTH KOREA) | PUS | | Weekly - Th | 30 | 3 |
| KUWAIT | KWI | | Biweekly - Th | 32 | 3 |
| LATVIA | RIX | | Weekly - Th | 24 | 3 |
| LESOTHO | | Include with South Africa. | | | |
| LIBYA | TIP | | Weekly - W | 19 | 3 |
| LIECHTENSTEIN | | Include with Switzerland. | | | |
| LITHUANIA | VNO | | Weekly - Th | 27 | 3 |
| LUXEMBOURG | LUX | | Weekly - Th | 14 | 1 |
| MACAO | MFM | | Weekly - Th | 34 | 3 |
| MACEDONIA | SKP | | Weekly - M | 20 | 3 |
| MADEIRA ISLANDS | FNC | | Biweekly - Th | 15 | 3 |
| MADAGASCAR | TNR | | Weekly - W | 25 | 3 |
| MALAWI | LMB | | Weekly - M | 35 | 3 |
| MALI | BKO | | Weekly - M | 35 | 3 |
| MALTA | MLA | | Weekly - Th | 20 | 3 |
| MARTINIQUE | FDF | | Biweekly - Th | 15 | 3 |
| MAURITANIA | | Include with Senegal | | | |

ORIGINAL

NJI&BMC

| COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | SAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| MAURITIUS | MRU | | Weekly - W | 30 | 3 |
| MOLDOVA | KIV | | Weekly - M | 28 | 3 |
| MONTSERRAT | MNI | | Weekly - Tu | 15 | 3 |
| MOROCCO | CAS | | Weekly - W | 25 | 3 |
| MOZAMBIQUE | MPM | | Weekly - M | 25 | 3 |
| NAMIBIA | | Include with South Africa. | | | |
| NAURU | ACW | | Weekly - Th | 35 | 3 |
| NEPAL | KTM | | Weekly - Th | 42 | 3 |
| NETHERLANDS | RTM | | Weekly - Th | 10 | 1 |
| NETHERLANDS ANTILLES (PHILIPSBURG) | SXM | Includes Saba, St. Eustatius, St. Maarten, and Anguilla. | Weekly - Tu | 12 | 3 |
| NETHERLANDS ANTILLES (WILLEMSTAD) | WMS | Includes Bonaire and Curacao. | Weekly - Tu | 15 | 3 |
| NEW CALEDONIA | NOU | | Weekly - Th | 33 | 3 |
| NEW ZEALAND | AKL | | Weekly - Su | 23 | 2 |
| NICARAGUA | MGA | | Weekly - W | 7 | 3 |
| NIGER | MFQ | | Weekly - M | 30 | 3 |
| NIGERIA | LOS | | Weekly - M | 26 | 3 |
| NORTHERN IRELAND | | Include with Great Britain. | | | |
| NORWAY | OSL | | Weekly - Th | 16 | 1 |
| OMAN | MCT | | Weekly - M | 30 | 3 |
| PAKISTAN | KHI | | Weekly - Th | 40 | 3 |
| PANAMA | PTY | | Weekly - M | 11 | 3 |
| PAPUA NEW GUINEA | LAE | | Weekly - Th | 32 | 3 |
| PARAGUAY | ASU | | Weekly - Th | 26 | 3 |
| PERU | LIM | | Weekly - M | 16 | 3 |
| PHILIPPINES | MNL | | Weekly - Th | 35 | 3 |
| POLAND | GYN | | Weekly - W | 18 | 3 |
| PORTUGAL | LIS | | Every 10 days. | 11 | 1 |
| QATAR | DOH | | Biweekly - Th | 32 | 3 |
| REUNION ISLAND | RUN | | Weekly - W | 25 | 3 |
| ROMANIA | CND | | Weekly - M | 21 | 3 |
| RUSSIA | MOW | | Weekly - Th | 20 | 3 |
| RWANDA | KGL | | Weekly - M | 35 | 3 |
| SABA | | Include with Netherlands Antilles (Philipsburg). | | 12 | 3 |
| SAO TOME AND PRINCIPE | | Include with Portugal. | | | |
| ST. CHRISTOPHER (ST. KITTS) AND NEVIS | SKB | | Weekly - Tu | 12 | 3 |
| ST. EUSTATIUS | | Include with Netherlands Antilles (Philipsburg). | | | |
| ST. HELENA | | Include with South Africa. | | 14 | |
| ST. LUCIA | SLU | | Weekly - Tu | 12 | 3 |
| ST. MAARTEN | | Include with Netherlands Antilles (Philipsburg). | | | |

ORIGINAL

NJI&BMC

| COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | SAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| ST. MARTIN | | Include with Guadeloupe. | | | |
| ST. VINCENT | SVD | | Weekly - Tu | 14 | 3 |
| SAUDI ARABIA | QDM | | Weekly - M | 35 | 3 |
| SENEGAL | DKR | | Weekly - M | 30 | 3 |
| SERBIA-MONTENEGRO (YUGOSLAVIA) | BEG | Includes Serbia, Montenegro, and Yugoslavia. | Weekly - W | 13 | 3 |
| SIERRA LEONE | FNA | | Weekly - Th | 18 | 3 |
| SINGAPORE | SIN | | Weekly - W | 30 | 3 |
| SLOVAK REPUBLIC (SLOVAKIA) | BTS | | Weekly - M | 17 | 3 |
| SOLOMON ISLANDS | HIR | Includes Santa Cruz Islands | Weekly - Th | 32 | 3 |
| SOUTH AFRICA | CPF | Includes: Botswana, Lesotho, Namibia, Transkei, St. Helena and Tristan da Cunha. | Weekly - M | 25 | 3 |
| SPAIN | BCN | Includes Andorra, Canary Islands, and Balearic Isl. | Weekly - M | 12 | 1 |
| SRI LANKA | CMB | | Weekly - W | 37 | 3 |
| SUDAN | KRT | | Weekly - Th | 28 | 3 |
| SURINAME | PBM | | Biweekly - Th | 20 | 3 |
| SWAZILAND | QMN | | Weekly - M | 30 | 3 |
| SWEDEN | MMA | | Weekly - W | 20 | 1 |
| SWITZERLAND | BSL | Includes Liechtenstein. | Weekly - Th | 14 | 1 |
| SYRIAN ARAB REPUBLIC (SYRIA) | DAM | | Weekly - Th | 18 | 3 |
| TAIWAN | TPE | | Weekly - Th | 32 | 3 |
| TANZANIA | DAR | | Weekly - M | 30 | 3 |
| TOGO | LFW | | Weekly - W | 25 | 3 |
| TONGA | TBU | | Weekly - Th | 27 | 3 |
| TRANSKEI | | Include with South Africa. | | | |
| TRINIDAD AND TOBAGO | POS | | Weekly - M | 11 | 3 |
| TRISTAN DA CUNHA | | Include with South Africa. | | | |
| TUNISIA | TUN | | Weekly - W | 28 | 3 |
| TURKEY | IST | | Weekly - W | 18 | 3 |
| TURKMENISTAN | | Include with Russia. | | | |
| TURKS AND CAICOS ISLANDS | GDT | | Weekly - Tu | 14 | 3 |
| UGANDA | EBB | | Weekly - Th | 40 | 3 |
| UKRAINE | ODS | | Weekly - M | 23 | 3 |
| UNITED ARAB EMIRATES | DXB | | Weekly - M | 35 | 3 |
| UNITED KINGDOM | | See Great Britain. | | | |
| URUGUAY | MVD | | Weekly - Th | 27 | 3 |
| UZBEKISTAN | TAS | | Weekly - Th | 22 | 3 |
| VANUATU | VLI | | Weekly - Th | 34 | 3 |
| VATICAN CITY | VCS | | Weekly - Th | 20 | 1 |
| VENEZUELA | CCS | | Weekly - F | 15 | 3 |
| VIETNAM | SGN | | Weekly - W | 30 | 3 |
| YEMEN | SAH | | Weekly - W | 20 | 3 |
| ZAMBIA | LVI | | Weekly - M | 27 | 3 |
| ZIMBABWE | BUQ | | Weekly - M | 27 | 3 |

ORIGINAL

RATE GROUP 1 (NJI&BMC)

AUSTRIA
BELGIUM
DENMARK
FINLAND
FRANCE
GERMANY
GIBRALTAR
GREAT BRITAIN & NORTHERN IRELAND
GREECE
GREENLAND
ICELAND
IRELAND
ISRAEL
ITALY
LUXEMBOURG
NETHERLANDS
NORWAY
PORTUGAL
SPAIN
SWEDEN
SWITZERLAND
VATICAN CITY

RATE GROUP 2 (NJI&BMC)

AUSTRALIA
JAPAN
NEW ZEALAND

RATE GROUP 3 (NJI&BMC)

ALBANIA
ALGERIA
ANGOLA
ANGUILLA
ANTIGUA and BARBUDA
ARGENTINA
ARMENIA
ARUBA
ASCENSION ISLANDS
AUSTRIA
AZERBAIJAN
BAHAMAS
BAHRAIN
BALEARIC ISLANDS
BANGLADESH
BARBADOS
BELARUS
BELIZE
BENIN
BERMUDA
BOLIVIA
BONAIRE
BOTSWANA
BOSNIA-HERZEGOVINA
BRAZIL
BRUNEI DARUSSALEM
BULGARIA
BURKINA FASO
BURMA (MYANMAR)
BURUNDI
CAMBODIA
CAMEROON
CANARY ISLANDS
CAPE VERDE
CENTRAL AFRICAN REPUBLIC
CHILE
COLOMBIA
CONGO, REPUBLIC OF THE (BRAZZAVILLE)
COOK ISLANDS
COSTA RICA
COTE D'IVOIRE (IVORY COAST)
CROATIA
CURACAO
CZECH REPUBLIC
DJIBOUTI
DOMINICAN REPUBLIC.
ECUADOR
EGYPT
EL SALVADOR
EQUATORIAL GUINEA
ERITREA
ESTONIA
ETHIOPIA
FALKLAND ISLANDS
FRENCH GUIANA
GABON
GAMBIA
GEORGIA
GHANA
GRENADA
GUADELOUP
GUATEMALA
GUINEA
GRENADA
GUADELOUP
GUATEMALA
GUINEA
GUYANA
HAITI
HONDURAS
HONG KONG

ORIGINAL

RATE GROUP 3 (NJI&BMC) (cont)

HUNGARY
INDIA
IRAN
JAMAICA
JORDAN
KAMPUCHE
KAZAKHSTA
KENYA
KOREA, REPUBLIC OF (SOUTH KOREA)
KUWAIT
LESOTHO
LIBYA
LITHUANIA
MACAO
MACEDONIA
MADEIRA ISLANDS
MADAGASCAR
MALAWI
MALI
MARTINIQUE
MAURITANIA
MAURITIUS
MOLDOVA
MONTSERRAT
MOROCCO
MOZAMBIQUE
NAMIBIA
NAURU
NEPAL
NETHERLANDS ANTILLES (PHILIPSBURG)
NETHERLANDS ANTILLES (WILLEMSTAD)
NEW CALEDONIA
NICARAGUA
NIGER
NIGERIA
OMAN
PAKISTAN
PANAMA
PAPUA NEW GUINEA
PARAGUAY
PERU
PHILIPPINES
POLAND
QATAR
REUNION ISLAND
ROMANIA
RUSSIA
RWANDA
SABA
SAO TOME AND PRINCIPE
ST. CHRISTOPHER (ST. KITTS) AND NEVIS
ST. EUSTATIUS
ST. HELENA
ST. LUCIA
ST. MARTIN
ST. VINCENT
SAUDI ARABIA
SENEGAL
SERBIA-MONTENEGRO (YUGOSLAVIA)
SIERRA LEONE
SINGAPORE
SLOVAK REPUBLIC (SLOVAKIA)
SOLOMON ISLANDS
SOUTH AFRICA
SRI LANKA
SUDAN
SURINAME
SWAZILAND
SYRIAN ARAB REPUBLIC (SYRIA)
TAIWAN
TANZANIA
TOGO
TONGA
TRANSKEI
TRINIDAD AND TOBAGO
TRISTAN DA CUNHA
TUNISIA
TURKEY
TURKMENISTAN
TURKS AND CAICOS ISLANDS
UGANDA
UKRAINE
UNITED ARAB EMIRATES
URUGUAY
UZBEKISTAN
VANUATU
VENEZUELA
VIETNAM
YEMEN
ZAMBIA
ZIMBABWE

ORIGINAL

# EXHIBIT B
## GLOBAL BULK ECONOMY (GBE) COUNTRY LIST (REVISED 9/5/01)

## OAKLAND INTERNATIONAL SERVICE FACILITY (OISF)

Note: Cutoff is 12 PM (noon) of business day prior to dispatch day.

| OISF COUNTRY | DESTINATION EXCHANGE OFFICE CODE | OBSERVATIONS | MAILING FREQUENCY-DISPATCH DAY | TRANSIT TIME TO DESTINATION PORT | RATE GROUP |
|---|---|---|---|---|---|
| AUSTRALIA | SYD | | Weekly - Tu | 26 | 2 |
| BANGLADESH | CGP | | Weekly - Tu | 26 | 3 |
| BRUNEI DARUSSALEM | BWN | | Weekly - Tu | 26 | 3 |
| BURMA (MYANMAR) | RGN | | Weekly - Th | 18 | 3 |
| CHINA | TSN | | Weekly - M | 20 | 3 |
| COOK ISLANDS | RAR | | Weekly - Tu | 26 | 3 |
| FIJI | SUV | | Monthly - Tu | 25 | 3 |
| HONG KONG | HKG | | Weekly - Tu | 26 | 3 |
| INDIA | BOF | | Weekly - M | 14 | 3 |
| INDONESIA | TNS | | Weekly - M | 14 | 3 |
| JAPAN | KWS | | Weekly - M | 14 | 2 |
| KIRIBATI | TRW | | Semimonthly - Tu | 34 | 3 |
| KOREA, DEM. PEOPLE'S REP. OF (NORTH KOREA) | | Include with Hong Kong. | | | |
| KOREA, REPUBLIC OF (SOUTH KOREA) | PUS | | Semimonthly - Tu | 30 | 3 |
| LAOS | VTE | | Semimonthly - Tu | 28 | 3 |
| MACAO | MFM | | Weekly - Tu | 12 | 3 |
| MALAYSIA | KUL | | Weekly - F | 13 | 3 |
| MONGOLIA | | Include with China. | | | |
| NAURU | ACW | | Weekly - M | 20 | 3 |
| NEPAL | KTM | | Weekly - Th | 18 | 3 |
| NEW CALEDONIA | NOU | | Weekly - Th | 18 | 3 |
| NEW ZEALAND | AKL | | Weekly - M | 36 | 2 |
| PAPUA NEW GUINEA | LAE | | Weekly - M | 16 | 3 |
| PHILIPPINES | MNL | | Weekly - M | 20 | 3 |
| SINGAPORE | SIN | | Weekly - M | 20 | 3 |
| SOLOMON ISLANDS | HIR | Includes Santa Cruz Islands. | Weekly - M | 20 | 3 |
| TAHITI | PPT | | Monthly - Tu | 25 | 3 |
| TAIWAN | TPE | | Monthly - Tu | 25 | 3 |
| THAILAND | BKK | | Monthly - Tu | 25 | 3 |
| TONGA | TBU | | Semimonthly - Tu | 25 | 3 |
| TUVALU | FUN | | Weekly - Tu | 15 | 3 |
| VANUATU | VLI | | Weekly - M | 19 | 3 |
| VIETNAM | SGN | | Weekly - M | 19 | 3 |
| WESTERN SAMOA | APW | | Semimonthly - Tu | 15 | 3 |

# Exhibit 2

## Letter dated March 21, 2005 from William J. Olson, Esquire mailed to Michael K. Plunkett

WILLIAM J. OLSON, P.C.
ATTORNEYS AT LAW
8180 GREENSBORO DRIVE, SUITE 1070
McLEAN, VIRGINIA 22102-3860
TELEPHONE (703) 356-5070
FAX (703) 356-5085
E-MAIL: wjo@mindspring.com
http://www.lawandfreedom.com

WILLIAM J. OLSON
(D.C., VA.)
JOHN S. MILES
(D.C., MD., VA., OF COUNSEL)
HERBERT W. TITUS
(VA., OF COUNSEL)

800 PENNSYLVANIA AVE., S.E.
SUITE 410
WASHINGTON, D.C. 20003-4303
TELEPHONE (202) 547-9090

March 21, 2005

Mr. Michael K. Plunkett
Manager, Pricing Strategy
U.S. Postal Service
475 L'Enfant Plaza, SW
Washington, DC 20260-3616

Re: Distribution Postal Company, Inc.

Dear Mr. Plunkett:

We represent Distribution Postal Company, Inc., 6202 Frankford Avenue, Baltimore, MD 21206 ("DPC"). As you know, DPC is a Postal Qualified Wholesaler of international mail under the rules of the United States Postal Service, and has an International Customized Mail Service Agreement ("ICM") with the United States Postal Service ("Postal Service") permitting DPC to obtain — and offer to clients — certain discounts with respect to U.S. international mail postage.

By letter dated October 11, 2004, DPC, through its counsel (and our co-counsel for purposes of this matter), James B. Kraft, Esquire, alerted you of DPC's objections with respect to the conduct in 2002 of another international mail shipping firm, American Mail Sort, LLC ("AMS"), as well as certain actions by the Postal Service and requested an investigation. By letter dated October 20, 2004, you responded that the investigation had taken place and nothing was found to be amiss vis-a-vis the Postal Service. DPC had assumed that you would have contacted DPC for relevant information in investigating the matter. Since that did not occur, Mr. Kraft and DPC asked for our assistance in approaching you on what has now become a fairly urgent matter.

**DPC's Circumstances and Request**

The maximum discount afforded DPC under its ICM service agreement with the Postal Service is 16 percent, which requires a minimum annual international postage volume of $25 million. To the extent that the minimum volume were not achieved, DPC would face a significant liability.

Although only five months into its ICM, due to the problems incurred in 2002, DPC currently is facing an obstacle, described below, in achieving the annual $25 million U.S. international postage minimum under its ICM agreement with the Postal Service, and DPC would ask the Postal Service to waive the annual volume minimum for the first year of its ICM agreement, from August 14, 2004 through August 13, 2005, and extend the period of the agreement (which presently expires on December 31, 2005) to August 13, 2006. This would permit DPC to fulfill the minimum volume requirement under the current agreement, as extended, if it achieved the $25 million U.S. international postage minimum by August 13, 2006. Alternatively, DPC would seek to cancel the current agreement, without penalty under section 9 thereof, and enter into a new, one-year agreement (*e.g.*, from March 1, 2005 to February 28, 2006), so that its undertaking to achieve a $25 million minimum international postage volume would begin to run from the start-date of that new agreement. We have summarized below the reasons for this request.

**Background**

**Unauthorized Cancellation of DPC's original ICM service agreement.** The obstacle now faced by DPC is the result of the loss of certain of DPC's international mail clients because of the fraudulent actions of one of its competitors, AMS, as facilitated by the Postal Service in cancelling DPC's original ICM service agreement and effectively transferring that agreement to DPC's competitor, AMS.

DPC's current ICM agreement is dated August 14, 2004. Previously, it had an ICM agreement with the Postal Service dated April 24, 2002, which was transferred, apparently because of alleged fraudulent representations made by one Robert Dunbebin, approximately one month later, to Mr. Dunbebin's company, AMS. At the time in question, in April 2002, Mr. Dunbebin was supposedly working on behalf of DPC, and signed the ICM on behalf of DPC. One month later, however, unbeknownst to DPC, the Postal Service transferred DPC's ICM agreement to Mr. Dunbebin's newly-established company, AMS. AMS, through Mr. Dunbebin, then continued to solicit and serve DPC's clients, as well as obtain new clients, for the benefit of AMS, a fact that did not come to DPC's attention in sufficient time to correct the situation. But for the Postal Service improperly transferring that ICM, the clients of AMS would be the clients of DPC.

**Postal Service Actions Contributing to DPC's Loss.** With respect to the Postal Service's role in the transactions described above, it is our understanding that the Postal Service takes the position that its termination of DPC's original (2002) ICM agreement was occasioned by the request of Mr. Dunbebin, who the Postal Service says it believed was acting on behalf of DPC. We have serious doubts about whether there was any legitimate basis for the Postal Service's action. Clearly, this was a situation that warranted making contact with DPC's president, Mr. Louis Haber. Indeed, DPC's ICM agreement with the Postal Service clearly provided for cancellation only upon "six (6) months notice in writing." *See* DPC/USPS ICM Service Agreement, Article 6, ¶ 5. The DPC/USPS ICM service agreement

was a three-year agreement, and it was cancelled one month after issuance, leaving DPC in the lurch. Moreover, DPC received no notices of any kind from the Postal Service in connection with the termination of its April 24, 2002 ICM. This cancellation caused DPC to lose a substantial portion of its international mail clientele, which it is now in the process of attempting to gain back.

Furthermore, even assuming that the Postal Service actually believed that Mr. Dunbebin would have had the authority to request termination of the DPC/USPS ICM service agreement, and that the agreement's cancellation provision should be overlooked, there appears to be no legitimate basis for the Postal Service to have then entered into an ICM agreement with AMS, which was Mr. Dunbebin's brand-new company. As you know, ICM service agreements which offer the maximum discount are limited to shippers, like DPC, which are Postal Qualified Wholesalers, and must demonstrate certain capabilities with respect to the tendering of certain international mail. *See* International Mail Manual, Sections 621-625 (Description of Postal Qualified Wholesale Program, etc.) and Section 297.2. (Qualifying Mailers for International Customized Mail).

Section 623.2.a. expressly provides, for example, that the company applying for Postal Qualified Wholesaler status "[m]ust have a minimum of one year of experience as an international or domestic mail consolidator, presorter, or letter shop." It is our understanding that AMS was newly formed in 2002, and had barely begun operations at the time it was given its ICM service agreement by the Postal Service. Accordingly, we would submit that AMS was not a Postal Qualified Wholesaler, and could not possibly have qualified as a Postal Qualified Wholesaler, in May of 2002, and that AMS thus would not have been eligible for the ICM service agreement it was given by the Postal Service in May, 2002. Section 623.2.b. expressly provides that the company "[m]ust have realized at least $1 million in gross international revenues with the Postal Service in the most recent calendar year for services it provided in connection with mail that originated in the United States." Again, AMS could not possibly have made such a showing. Based upon these facts alone, and even without seeing the AMS application form, there would appear to have been no legitimate reason that would support the Postal Service's acceptance of AMS as a Postal Qualified Wholesaler, and thus no basis for issuance of an ICM service agreement to AMS in May 2002. We are not certain, of course, concerning all of the reasons for why the action that was taken actually occurred, but there is clear evidence that it should not have occurred.

**Consequences of the Postal Service's Actions.** The consequences of the Postal Service's actions have been far-reaching for DPC, which has been struggling for some time now to regain the clientele that it lost to Mr. Dunbebin's company through the machinations described above.[1]

---

1 DPC has instituted litigation against AMS — the suit is pending as Distribution Postal Company, Inc. v. American Mail Sort, LLC, et al. Civil No. 24-C-04-007557, Circuit

DPC believes that fairness would dictate the Postal Service waiving the first year's minimum volume amount under DPC's ICM agreement with the Postal Service, canceling the existing contract, and entering into a new ICM agreement with DPC. Alternatively, DPC would request an extension of 12 months with respect to its first year under the ICM agreement, which it believes may be necessary to achieve the minimum $25 million international shipping volume for the first year.

Request for Waiver or Amendment of ICM Agreement

DPC would like to work with the Postal Service to arrive at a reasonable accommodation with respect to DPC's current ICM service agreement, and has asked us to summarize DPC's legal position for your review. **In light of what has transpired, as described above, we would trust that the Postal Service would agree to a waiver of the $25 million annual international mail/postage minimum for the first year under its current ICM service agreement with the Postal Service or, alternatively, an extension of time of 12 months to meet the first year's minimum volume requirement.**

Although DPC is not pursuing a legal claim against the Postal Service with respect to the above matters at the current time, this possibility has been considered. However, we are informed that no such claim would be pursued by DPC if the ICM service agreement can be amended, or DPC's request can be accommodated, as set forth above.

DPC's position is supported by law and equity, and its request would not prejudice the Postal Service. DPC is an accomplished shipper of international postage, and has enjoyed an enviable reputation for many years now in the international mail community. Accommodating its current request is in the best interests of the Postal Service, which can only benefit from a continuation of what has been a mutually rewarding relationship. If DPC were penalized unfairly for failing to realize the $25 million annual minimum in this first year of its new ICM service agreement as a result of the matters described above, the consequences to both DPC and the Postal Service would be significant. Hopefully, such adverse consequences will not materialize.

We believe the Postal Service would be benefitting itself, as well as the international mailing community, if it resolves this matter by granting DPC's request. We would strongly urge you to do so, for the reasons stated above.

---

Court for Baltimore City, MD — in an effort to recoup some of its losses, but its efforts to regain the momentum and clientele it lost because of the termination of its original ICM agreement have not yet produced the international postage volume that it expected to achieve.

We would also ask that you get back to us on this matter within the next two weeks, and look forward to hearing from you.

Sincerely yours,

William J. Olson (by fm)

William J. Olson

WJO:mm

Contents Country Index

# 6 Special Programs

## 610 Global Direct Service

### 611 Global Direct — Canada Admail Ancillary Services

#### 611.1 Business Reply Service

This service provides for the return of Canadian business reply mail through the Postal Service to a specified address in Canada. Detailed specifications for this service are contained in Publication 524, *Global Direct — Canada Admail*. The rates for this service are $0.45 for items not weighing over 1.06 ounces (30 grams) and $0.65 for items weighing over 1.06 ounces (30 grams) but not over 1.76 ounces (50 grams).

#### 611.2 Return of Undeliverable Mail

Mailers using a Canadian identity (Canadian indicia and return address) may have undeliverable items returned to the U.S. through a Canadian return address. The sender must endorse items "Return Postage Guaranteed" and use the return address specified by the Postal Service. The rates are:

| Weight (not over) | Rate |
|---|---|
| 3.52 oz. (100 grams) | $0.80 |
| 7.04 oz. (200 grams) | $1.32 |
| 17.60 oz. (500 grams) | $2.09 |

If a U.S. permit is used, returned items are subject to the applicable surface printed matter postage that would have been paid from the United States to Canada.

## 612 Global Direct — Canada Publications Mail Ancillary Services

### 612.1 Business Reply Service

This service provides for the return of Canadian business reply mail through the Postal Service to a specified address in Canada. Detailed specifications for this service are contained in Publication 524, *Global Direct — Canada Admail.* The rates for this service are:

a. $0.45 for items weighing 1.06 ounces (30 grams) or less.

b. $0.65 for items weighing more than 1.06 ounces (30 grams) but not more than 1.76 ounces (50 grams).

### 612.2 Return of Undeliverable Mail

Only the address block of the publication will be returned. The rate for this service is $0.50 per address block returned.

# 620 Postal Qualified Wholesaler Program

## 621 Description

The Postal Qualified Wholesaler Program of the United States Postal Service establishes relationships between the Postal Service and wholesalers of international mail so that the business of both parties is increased through worksharing and volume pricing. Any Postal Qualified Wholesaler using a representative or agent must ensure that the representative or agent adheres to the same rules and regulations of the Postal Qualified Wholesaler Program when preparing and tendering qualified international mail to the Postal Service.

## 622 Pricing

A Postal Qualified Wholesaler will receive rates from the Postal Service, including applicable volume rates or an International Customized Mail rate, if special circumstances warrant, for any available service offered by the Postal Service for its use in submitting bids to customers.

## 623 Qualifying as a Wholesaler

### 623.1 Letter of Request

Any company desiring to be a Postal Qualified Wholesaler must submit a letter of request to:

MANAGER INTERNATIONAL PRODUCT DEVELOPMENT
US POSTAL SERVICE
475 L'ENFANT PLZ SW RM 3216
WASHINGTON DC 20260-3216

The letter must demonstrate how a company meets the criteria listed in 623.2. The company must certify that it is not disqualified from being a Postal Qualified Wholesaler under the guidelines listed in 623.3 and state that it agrees to all of the terms and conditions of the Postal Qualified Wholesaler Program. The Postal Service will make the final determination of who shall be a Postal Qualified Wholesaler.

## 623.2 Criteria

The wholesaler:

a. Must have a minimum of one year of experience as an international or domestic mail consolidator, presorter, or letter shop.

b. Must have realized at least $1 million in gross international revenues with the Postal Service in the most recent calendar year for services it provided in connection with mail that originated in the United States.

c. Must use a permit imprint that is allowable under the postage payment systems referenced in *Domestic Mail Manual* (DMM) P910, P920, and P930. The wholesaler may use its own permit or that of its customers. If the wholesaler uses the customer's permit, then the wholesaler and its agent must specify to the Postal Service the permit numbers used and provide an additional itemized report identifying the volume and revenue for each international mailing.

d. Must have the ability to collect international mail at customers' facilities on a daily (Monday through Friday) basis. If the wholesaler and its agent provide pick-up of mail on Saturdays, Sundays, and/or holidays, it must state those days it provides pick-up service.

e. Must perform the actual handling and preparation of the international mail prior to tendering to the Postal Service in accordance with the applicable mail makeup requirements, maintain a processing facility and staff to provide the services described herein, and state the address and square footage of the facility and the number of persons employed who are involved in the handling and preparation of international mail.

f. Must have experience, capability, and knowledge to presort, pouch, or otherwise containerize the customer's international mail per the Postal Service requirements for any available service offered by the Postal Service.

g. Must have the ability to transport and tender the international mail to an agreed-upon Postal Service acceptance point.

h. Must give at least the following percentages of its gross revenue from international mailing to the Postal Service:

   (1) First year of qualification: At least 75%

   (2) Second year of qualification: At least 85%.

   (3) Third year and subsequent years of qualification: At least 90%.

i. Must be familiar with or take steps to comply with the Malcolm Baldridge National Quality Award Program and/or ISO 9000 certification. If a wholesaler has ISO 9000 certification, it must state the

date of such certification and provide a copy of its certification award to the Manager, Postal Qualified Wholesalers.

*Note:* Any Postal Qualified Wholesaler using a representative or agent must ensure that the representative or agent adheres to the rules and regulations of the Postal Qualified Wholesaler Program when preparing and/or tendering qualified international mails to the Postal Service.

### 623.3 Disqualification

Any wholesaler will be disqualified as a Postal Qualified Wholesaler if it does not meet any of the following conditions:

a. Must first recommend Postal Service services to its customers who request international mailing services.

b. Must use the level of Postal Service international service that the customer requires and for which the customer has paid.

c. Neither the wholesaler, a subsidiary, an affiliate, an agent, nor a parent company can be:

   (1) On the List of Parties Excluded from Procurement Programs of the Postal Service and the United States Government.

   (2) A licensed wholesaler or consolidator of any foreign postal administration, or owned by or a division of any foreign postal administration.

   (3) A direct competitor of the Postal Service domestically or internationally that provides expedited or parcel delivery services or air transportation services.

   (4) Must not be in arrears for any amount due to the Postal Service.

d. Gross revenue from non-Postal Service mail included in 623.2h does not include revenues which the wholesaler, a subsidiary, an affiliate, or a parent company receives for remail when the wholesaler's customer selects the remail service and directs the wholesaler to use the remail service.

e. The wholesaler shall describe any value-added services provided in addition to collection, sortation, and tendering of international mail. For any value-added service, the wholesaler must state how it meets the requirements of 623.2e and must specify if the value-added services are completed in-house or are subcontracted.

## 624 Benefits

### 624.1 Qualified List

The Postal Service will maintain a list of Postal Qualified Wholesalers. The list shall be distributed upon request to any person who indicates a need for an international wholesaler. The list shall include all services that the wholesaler provides in addition to collection, sortation, and tendering of international mail.

### 624.2 Preapproved Advertising

A wholesaler may state that it has been qualified as a Postal Qualified Wholesaler of the Postal Service. Any use of the Postal Service logo or any Postal Service trademark or advertising material, including letterhead and stationery, stating that the wholesaler has been qualified by the Postal Service must be approved in advance and in writing by the Manager, Postal Qualified Wholesalers.

### 624.3 Right of First Refusal

Postal Qualified Wholesalers must give the Postal Service the first opportunity to handle any international mail originating in the United States that it receives from its customers. This includes giving the Postal Service the first opportunity to quote prices for handling mail that is the subject of a formal or informal request for proposals or quotes from a customer. If the services of a wholesaler are needed, the Postal Service may request competitive bids from all Postal Qualified Wholesalers when it quotes prices for handling international mail that is the subject of a formal or informal request for proposals or quotes from a customer.

## 625 Length of Qualification

### 625.1 Approval Period

Each wholesaler will be qualified for a period of two years. At the end of that two-year period the Postal Service must again qualify the wholesaler.

### 625.2 Disqualification

If the Postal Service discovers at any time, by whatever means, that the wholesaler has not complied with any of the terms and conditions herein, the Manager, Postal Qualified Wholesalers will send the wholesaler written notice via Express Mail that it has not complied with these terms and conditions and that it will be stricken from the list of Postal Qualified Wholesalers. The wholesaler will have three business days to respond in writing via Express Mail to the Manager, Postal Qualified Wholesalers that it should not be removed from the list and the reasons why it should not be stricken. The Postal Service will render its decision on the objection within five business days after its receipt.

This page intentionally left blank

# Exhibit 3

## Judgment from the Circuit Court of Baltimore City against American Mail Sort and Robert Dunbebin

| | | |
|---|---|---|
| **DISTRIBUTION POSTAL CONSULTANTS, INC.** | * | **IN THE** |
| Plaintiff | * | **CIRCUIT COURT** |
| *vs.* | * | **FOR** |
| **ROBERT ~~DUBEBIN~~** Dunbedin Individually and doing business as **AMERICAN MAIL SORT** *et al.* | * | **BALTIMORE CITY** |
| | * | |
| Defendants & 3rd Party Plaintiffs | * | **Case No. 4C-04-007557** |
| *vs.* | * | |
| **LOUIS F. HABER, JR.** | * | |
| 3rd Party Defendant | * | |

* * * * * * * * * * * * *

RECEIVED DEC 19 2005 CIRCUIT COURT BALTIMORE CITY

## JUDGMENT AND ORDER

This case was called for trial on the merits on December 12, 2005. The Defendants and 3rd Party Plaintiffs failed to appear. They had also failed to appear for the Pre-Trial Conference. They had also failed to respond to discovery, both a First Request for Production of Documents and a First Request for Admissions of Fact and Genuineness of Documents. Judgment on the merits was granted to the Plaintiff and testimony was taken and evidence was presented as to the nature and extent of its damages. Based upon the admissions of fact the Court also found that the Defendants and each of them had acted with malicious intent in an effort to damage the Plaintiff and seize control of its business. It is, therefore, this 12th day of December, 2005

**ORDERED**, that judgment be entered in favor of the Plaintiffs against the Defendants and each of them, jointly and severally, and compensatory damages be awarded unto the Plaintiff in the amount of Seven hundred fifty-five thousand, one hundred ninety-seven 31/100 Dollars ($755,197.31) against the Defendants and each of them, jointly and severally; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, prohibited from using the Plaintiff's manifest software and any and all modifications to it; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, directed to immediately surrender unto the Plaintiff, or to the Sheriff of Baltimore City acting on behalf of the

as to each and every count

Plaintiff, the manifest software and any and all modifications to it; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, directed to immediately surrender unto the Plaintiff, or to the Sheriff of Baltimore City acting on behalf of the Plaintiff, their customer list and the status of all of their current business with each and every customer; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, prohibited from using the ICM that they wrongfully obtained from the United States Postal Service; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, directed to surrender the ICM, and all of the rights that they wrongfully obtained thereunder, unto the United States Postal Service; and, it is further

**ORDERED**, that, upon the Plaintiff's receipt of the said software, the Plaintiff shall be, and it is hereby, empowered to notify the Defendants', and each of their, customers of the wrongful acts of the Defendants; and, it is further

**ORDERED**, that the Defendants and each of them shall be, and they are hereby, immediately prohibited from using the manifest software and any and all modifications of it; from contacting any of their customers in any way that would be deemed detrimental to the interests of the Plaintiff; from selling, transferring, alienating, pledging or otherwise encumbering the manifest software and any and all modifications to it; as well as any selling, transferring, alienating, pledging or encumbering the assets or any part of their respective businesses in any way, nature or sort; and, it is further

**ORDERED**, that upon the judgment entered in favor of the Plaintiffs against the Defendants and each of them, jointly and severally, punitive damages shall be, and they are hereby, awarded unto the Plaintiff in the amount of Ten Million Dollars ($ 10,000,000 ) against the Defendants and each of them, jointly and severally; and, it is further

**ORDERED**, that upon the judgment and entry of the said punitive damages against the ~~Defendants and each of them, jointly and severally, the costs of this matter, including~~ the Plaintiff's

attorney's fees shall be, and they are hereby, awarded unto the Plaintiff in the amount of ______ ______ Dollars ($______) against the Defendants and each of them, jointly and severally; and, it is further

**ORDERED**, that upon the filing of a either a Motion to Vacate Judgment with this Court or an appeal to the Court of Special Appeals or Court of Appeals of Maryland by the Defendants or any of them, a supersedeas bond in the amount of ______ Dollars ($______), shall be filed with the Clerk of this Court.

JOHN M. GLYNN
Judge
The Judges's signature appears on the original document.

cc:

James B. Kraft, Esquire
Law Offices of James B. Kraft
445 S. Robinson Street
Baltimore, Maryland 21224
Attorneys for Plaintiff

Mr. Robert Dunbebin
Individually and as Resident Agent
for American Mail Sort *et al.*
3501 Brehms Lane
Suite B
Baltimore, Maryland 21213
*pro se* Defendants & 3rd Party Plaintiffs

TRUE COPY
TEST
FRANK M. CONAWAY, CLERK

12-12-05