No. 08-17C
(Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Distribution Postal Consultants, Inc.,

Plaintiff,

v.

The United States,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, DEFENDANT'S MOTION TO DISMISS

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

MATTHEW H. SOLOMSON
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3274

March 31, 2008

Counsel for Defendant

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. The United States Is Entitled To Summary Judgment Because Mr. Dunbebin Had Apparent Authority To Act For DPC When He Terminated Its Original ICM Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Summary Judgment Is Appropriate On The Issue Of Mr. Dunbebin's Apparent Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. As A Matter Of Law, Mr. Dunbebin Had Apparent Authority To Act On Behalf of DPC And To Request That USPS Terminate The Original ICM Agreement . . . . . . . . . . . . . . . . . . . 8

II. Count II Of DPC's Complaint In This Case, Alleging Breach Of The Implied Covenant Of Good Faith And Fair Dealing, Should Be Dismissed . . . . . . . . . . 12

A. The Doctrine Of <u>Res</u> <u>Judicata</u> Bars Count II Of DPC's Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. In The Alternative, Count II Should Be Dismissed Because This Court Lacks Jurisdiction Over Tort Claims . . . . . . . . . . . 14

C. Even If <u>Res</u> <u>Judicata</u> Does Not Preclude Count II, And Assuming Count II Is Within This Court's Jurisdiction, This Court Nevertheless Should Dismiss That Count Because It Fails To State A Claim Upon Which Relief Can Be Granted . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

### CASES

Adams v. United States,
20 Cl. Ct. 132 (1990) . . . . . . . . . . 16

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 6, 7

Bell Atlantic Corp. v. Twombly,
-- U.S. --, 127 S. Ct. 1955 (2007) . . . . . . . . . . 16, 17

Brunner v. United States,
70 Fed. Cl. 623 (2006) . . . . . . . . . . 8, 10

Burnett v. United States,
40 Fed. Cl. 806 (1998) . . . . . . . . . . 12

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . 17

DPC v. Dunedin and AMS,
Case No. 4C-04-007557 (Cir. Ct. Balt. City 2004) . . . . . . . . . . 3, 7

DPC v. USPS,
No. RDB-07-200 (D. Md. 2007) . . . . . . . . . . 5

Dachman v. United States,
73 Fed. Cl. 508 (2006) . . . . . . . . . . 12, 15, 16

Detroit Housing Corp., v. United States,
55 Fed. Cl. 410 (2003) . . . . . . . . . . 17, 19

Edelmann v. United States,
76 Fed. Cl. 376 (2007) . . . . . . . . . . 15

F.D.I.C. v. Meyer,
510 U.S. 471 (1994) . . . . . . . . . . 14

Franklin Savings Corp., v. United States,
56 Fed. Cl. 720 (2003) . . . . . . . . . . 14

Gibbs v. Buck,

307 U.S. 66 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gilbert v. DaGrosa,
756 F.2d 1455 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Henke v. United States,
60 F.3d 795 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Jentoft v. United States,
450 F.3d 1342 (Fed. Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Keene Corp. v. United States,
508 U.S. 200 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Lyons v. United States,
45 Fed. Cl. 399 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Magnus Electr., Inc. v. La Republica Argentina,
830 F.2d 1396 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Maxima Corp. v. United States,
847 F.2d 1549 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

McAfee v. United States,
46 Fed. Cl. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

McCauley v. United States,
38 Fed. Cl. 250 (1997), aff'd, 152 F.3d 948 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 15

McNutt v. General Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Montego Bay Imports, Ltd. v. United States,
25 Cl. Ct. 639 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,14,16

Naylor v. United States,
53 Fed. Cl. 172 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pratt v. United States,
50 Fed. Cl. 469 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ralph Larson & Son, Inc. v. United States,
17 Cl. Ct. 39 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Spezzaferro v. FAA,
807 F.2d 169 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

State of Alaska v. United States,
35 Fed. Cl. 685, 704 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Torncello v. United States,
231 Ct. Cl. 20 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

United States v. Gil,
657 F.2d 712 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Sanchez,
521 F.2d 244 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATUTES**

28 U.S.C. §§ 1346(b), 2671-2680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| Distribution Postal Consultants, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-17C |
| | ) | (Judge Bruggink) |
| v. | ) | |
| | ) | |
| The United States, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND,**
**IN THE ALTERNATIVE, DEFENDANT'S MOTION TO DISMISS**

Defendant, the United States, respectfully requests this Court to grant summary judgment to the United States on Counts I and II of the complaint, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). In the alternative, we respectfully request this Court to dismiss Count II of plaintiff's complaint for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6), or, pursuant to RCFC 12(b)(1), for lack of subject matter jurisdiction. In support of our motions, we rely upon plaintiff's complaint (including the exhibits attached thereto), our brief, and the attached exhibits.

**DEFENDANT'S BRIEF**

QUESTIONS PRESENTED

1. Whether the United States is entitled to summary judgment on Counts I and II of plaintiff's complaint because the United States relied upon the apparent authority of plaintiff's representative to terminate plaintiff's contract.

2. In the alternative, whether Count II of plaintiff's complaint should be dismissed because it is barred by the doctrine of res judicata, fails to state a claim within this Court's subject matter jurisdiction, or to state a claim upon which relief may be granted.

## STATEMENT OF FACTS[1]

Plaintiff, Distribution Postal Consultants ("DPC"), is a mail consolidator in the business of producing, servicing, and managing mail for its customers. Plaintiff's Complaint ("Compl.") at ¶ 4. DPC has had extensive dealings with the United States Postal Service ("USPS" or "Postal Service"), including having entered into numerous agreements with USPS for postal discounts on its mailing services. Compl. at ¶ 5. DPC passes along the discounts to its customers, allowing them to ship postal items for less than USPS's normal rates. Id.

On April 24, 2002, Mr. Robert Dunbebin, in his capacity as Vice-President of DPC, signed an International Customized Mail Agreement ("Original ICM Agreement" or "Original Agreement") with USPS.[2] Compl. at ¶ 8; see also Pl. Exh. 1 at 7.[3] The Original ICM Agreement was a three year contract giving DPC a 16% discount on international mail, but required that DPC tender, to USPS, mail generating at least $25,000,000 of actual postage on an annual basis. Compl. at ¶ 8; Pl. Exh. 1 at Art. 8. Under the terms of the Original ICM Agreement, if DPC did not meet its annual minimum postage obligation, additional postage would be due to USPS based upon a schedule of discounts for the amount of mail actually tendered. Id. Finally, DPC had only three months to pay USPS any such additional postage due. Id.

On May 30, 2002, Mr. Dunbebin, purportedly acting on behalf of DPC, requested that

---

1 We treat the facts alleged in plaintiff's complaint as true solely for the purpose of our motion to dismiss. See Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).

2 The Original Agreement is attached to plaintiff's complaint as Exhibit 1 (hereinafter "Pl. Exh. 1"). Additional exhibits attached to plaintiff's complaint are cited to herein as "Pl. Exh. _".

3 Although DPC's complaint alleges that the date of the agreement was April 2, 2002, the agreement itself is dated April 24, 2002 (by both parties' signatories). See Pl. Exh. 1.

USPS terminate the Original ICM Agreement. See Pl. Exh. 2 (Letter from W. Olson to M. Plunkett) at 2**.** USPS agreed to Mr. Dunbebin's request. Id. Thus, on May 30, 2002, Mr. John Alepa, a USPS manager, and Mr. Dunbebin – once again representing himself as Vice-President of DPC – signed an amendment to DPC's Original ICM Agreement that terminated that contract. See DPC's Complaint in DPC v. Dunedin and AMS, Case No. 4C-04-007557 (Cir. Ct. Balt. City 2004) at ¶ 8; Amendment One to the Original ICM Agreement.[4]

On the same day that Mr. Dunbebin had USPS terminate DPC's Original ICM Agreement, he signed a new ICM agreement with USPS on behalf of American Mail Sort, LLC (the "AMS ICM Agreement"). See Pl. Exh. 4; AMS ICM Agreement at 7 (attached hereto as Def. Exh. 1).

DPC alleges that it learned, for the first time, in May 2004, that it no longer had an ICM agreement with USPS because Mr. Dunbebin had terminated DPC's Original ICM Agreement in May 2002. Compl. at ¶ 12. However, during the two year period following the termination of the Original Agreement – from May 2002 until May 2004 – DPC never informed USPS that the amendment to the Original ICM Agreement was invalid. USPS received no shipping volume from DPC during this two year period. See Def. Exh. 10 (May 11, 2005 Letter from M. Plunkett to W. Olson) at 2.

---

[4] Both documents are attached as Exhibit 4 to DPC's complaint in this case. We note that DPC's case in state court was captioned incorrectly, misspelling Mr. Dunbebin's name as "Dunedin." In that case, DPC sued Mr. Dunbebin and American Mail Sort ("AMS") in the Circuit Court for Baltimore City. Compl. at ¶ 20; Pl. Exh. 4. DPC alleged AMS's ICM agreement with USPS directly interfered with DPC's business by preventing DPC from meeting its minimum postage obligations. Compl. at ¶¶ 15-16, 20; Pl. Exh. 4. On December 12, 2005, DPC received a judgment against AMS and Mr. Dunbebin, jointly and severally, in the amount of $755,197.31, plus $10,000,000.00 in punitive damages. Compl. at ¶ 21; Pl. Exh. 4.

DPC thereafter claimed that the Original ICM Agreement was improperly transferred to AMS, and demanded that USPS comply with the terms of the Original ICM Agreement. Compl. at ¶ 12. On August 4, 2004, however, USPS entered into a new ICM agreement with DPC (the "Second ICM Agreement"). Compl. at ¶ 14. The Second ICM Agreement had an effective date of August 14, 2004. See Second ICM Agreement at Art.12 (attached hereto as Def. Exh. 2). Upon the expiration of the Second ICM Agreement, DPC and USPS executed a new ICM agreement (the "Third ICM Agreement) in December 2005. See Third ICM Agreement at Art. 12 (attached hereto as Def. Exh. 3). The Third ICM Agreement was to expire on December 31, 2006. Id.

In 2004, 2005, and 2006, DPC failed to meet its minimum postage obligations as required by the New ICM Agreement. Compl. at ¶¶ 16, 28. As a result, and as required by the terms of the new agreements, DPC was required to pay USPS the amount of the unearned discount, or deficiency, for the years in which it failed to meet its minimum postage obligation. Id. at ¶ 28. USPS accordingly notified DPC that it owed a deficiency of approximately $136,000 for failing to meet its minimum postage obligation. Id. In addition, USPS refused to further renew its ICM agreement with DPC until it paid the deficiency. Id; see also December 1, 2006 Letter from M. Plunkett to L. Haber, Jr. (attached hereto as Def. Exh. 4).

On February 27, 2006, DPC filed an administrative claim under the provisions of the Federal Tort Claims Act ("FTCA"), see 28 U.S.C. §§ 1346(b), 2671-2680, for monetary damages allegedly sustained by DPC. Compl. at ¶ 25. On September 26, 2006, USPS denied the claim and found no negligent act or omission by USPS or any of its employees. See Pl. Exh. 5 (Sept. 26, 2006 Letter from W. Wiedermann-Hudson, Esq. to R. Scarlett, Esq.).

In January, 2007, DPC sued USPS in United States District Court in Maryland. See DPC's Complaint in DPC v. USPS, No. RDB-07-200 (D. Md. 2007) (attached hereto as Def. Exh. 5). In that case, DPC alleged that USPS breached the Original ICM Agreement and an implied covenant of good faith and fair dealing. Id. DPC also sought a preliminary injunction against USPS to continue the then-existing ICM Agreement that USPS refused to renew until DPC paid its deficiency. Id. On January 26, 2007, the District Court issued a six month preliminary injunction to allow DPC to continue operating under the then-existing ICM agreement. See Jan. 25, 2007 TRO Hearing before Judge Quarles, Jr., DPC v. USPS, No. RDB-07-200 (D. Md. 2007) ("TRO Tr.") (attached hereto as Def. Exh. 8); January 26, 2007 Order in DPC v. USPS, No. RDB-07-200 (D. Md. 2007) (attached hereto as Def. Exh. 6).

On June 4, 2007, the District Court vacated the preliminary injunction, dismissed DPC's implied covenant of good faith and fair dealing claim, and, on jurisdictional grounds, transferred DPC's case (i.e., only the breach of contract claim) to this Court. See June 4, 2007 Motions Hearing before Judge Richard Bennett, DPC v. USPS, No. RDB-07-200 (D. Md. 2007), at Tr. 35:8-25; 36:1-5; 36:24-25; 37:1-2 ("Mot. Tr.") (attached hereto as Def. Exh. 9); Judge Bennett's June 4, 2007 Order (attached hereto as Def. Exh. 7). In so ordering, the District Court found, and DPC conceded, that its claim for breach of implied covenant of good faith and fair dealing was a tort claim. Mot. Tr. 16:5-8; 35:8-12; 35:23-25; 36:1-5. Following the transfer of DPC's case to this Court, DPC filed the complaint, now at issue, alleging breach of contract (Count I) and breach of an implied covenant of good faith and fair dealing (Count II).

# ARGUMENT

The United States is entitled to summary judgment on both counts of DPC's complaint because there is no dispute that Mr. Dunbebin had apparent authority to act on behalf of DPC when he requested the Postal Service to terminate DPC's Original ICM Agreement. Moreover, this Court should dismiss Count II of DPC's complaint in this case because it is barred by res judicata, and, in any event, either states a claim "sounding in tort" – and is thus not within this Court's jurisdiction – or does not state a claim upon which relief can be granted.

## I. The United States Is Entitled To Summary Judgment Because Mr. Dunbebin Had Apparent Authority To Act For DPC When He Terminated Its Original ICM Agreement

### A. Summary Judgment Is Appropriate On The Issue Of Mr. Dunbebin's Apparent Authority

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989).

A court may consider a motion for summary judgment in stages. The initial inquiry should be whether the movant has presented an adequate legal basis for its motion. In this case, DPC's claims must fail as a matter of law because the Postal Service terminated DPC's contract at the request of its agent, who had apparent authority to make such a request on behalf of DPC.

Once a movant has established an adequate legal basis for its motion, the Court must consider whether the opposing party has identified any genuine issues of material fact. The first step is to determine whether the issues raised are truly factual issues, or are issues of law. The second step is to determine what subset of the truly factual issues are material to the decision of

the case. The third step is to examine the evidence presented by the parties to determine whether there is any genuine issue concerning any material factual issue. Ralph Larson & Son, 17 Cl. Ct. at 43 (describing three steps); accord Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

DPC alleges that USPS breached the Original ICM Agreement by transferring it to American Mail Sort ("AMS"). Compl. at ¶ 35. In that regard, however, DPC admits that USPS did not actually transfer the Original ICM Agreement to AMS, but rather that USPS only "effectively" transferred that agreement to AMS, when USPS terminated DPC's agreement and signed a new one with AMS. See Pl. Exh. 2 at 2.

DPC has conceded, however, that Mr. Dunbebin represented that he had actual authority to terminate DPC's Original ICM Agreement that he executed, on behalf of DPC, with USPS. See Pl. Exh. 4 (DPC's Complaint, at ¶ 8, in DPC v. Dunedin and AMS, Case No. 4C-04-007557 (Cir. Ct. Balt. City 2004); Amendment One to the Original ICM Agreement); Def. Exh. 8 (TRO Tr. at 12:4-10). Moreover, DPC does not – indeed, cannot – allege that it had an exclusive ICM agreement with USPS; nor, for that matter, does DPC allege that USPS promised that it would not enter into ICM agreements with other mail consolidators. Thus, as a matter of law, USPS did not breach the Original ICM Agreement simply by signing an ICM agreement with AMS.

Accordingly, the validity of DPC's breach of contract claim turns not upon whether USPS entered into other ICM agreements with DPC competitors but, rather, upon whether Mr. Dunbebin had the apparent authority to request that USPS terminate the Original ICM Agreement. As demonstrated in detail below, this case is ripe for summary judgment because

there is no dispute that Mr. Dunbebin had such authority and that USPS terminated the Original ICM Agreement only at his request.

B. As A Matter Of Law, Mr. Dunbebin Had Apparent Authority To Act On Behalf Of DPC And To Request That USPS Terminate The Original ICM Agreement

While a government agent must have actual authority in order to bind the government in contract, a private entity can be bound by the acts of an agent having only apparent authority. Brunner v. United States, 70 Fed. Cl. 623, 627 (2006). Apparent authority is the power held by an agent "to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006); see also Brunner, 70 Fed. Cl. at 628 (quoting Restatement (Second) of Agency § 8 cmt. a (1958) for the proposition that apparent authority is the "authority that a principal makes third parties believe he has conferred on an agent"). Apparent authority is created "by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." Restatement (Third) of Agency § 3.03 (2006).

A principal may create the appearance of an agent's authority in several ways. See Restatement (Third) of Agency § 3.03 cmt. b (2006); see also Brunner, 70 Fed. Cl. at 628 (citing Restatement (Second) of Agency § 8 cmt. b; § 27 cmt. a; § 49 cmts. b, c; § 159 cmt. b., and noting that a principal may create the appearance of an agent's authority by making statements directly to third parties, by authorizing the agent to communicate the scope of delegated power, or by employing the agent in a manner that creates the appearance of authority). A principal thus may make a manifestation of an agent's authority by "placing an agent in a defined position in an

organization or by placing an agent in charge of a transaction or situation." Restatement (Third) of Agency § 3.03 cmt. b (2006). In such a case, "[t]hird parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so." Id.

In this case, there is no dispute that Mr. Dunbebin, at a minimum, had apparent authority to act for DPC in May 2002, when he signed the amendment to the Original ICM Agreement that terminated that agreement. DPC concedes that, on April 24, 2002, Mr. Dunbebin had actual authority to contract on behalf of DPC when he signed the Original ICM Agreement with USPS.[5] See Def. Exh. 8 (TRO Tr. 9:10-24; 10:11-22; 11:16-22 (DPC's counsel repeatedly concedes that Mr. Dunbebin had authority to sign the Original ICM Agreement on behalf of DPC)). Thus, by authorizing Mr. Dunbebin to sign the Original ICM Agreement as the company's Vice-President, DPC cloaked Mr. Dunbebin with apparent authority to terminate that agreement. See Restatement (Third) of Agency § 3.03 cmt. b (2006) ("If a corporation permits a vice president to exercise significant transactional functions and to make or appear to be in control of operational decisions, it creates a basis on which actual or apparent authority may arise.").

Accordingly, when Mr. Dunbebin sought to terminate the Original ICM Agreement, USPS had every reason to believe that he still had authority to act on behalf of DPC. In that regard, DPC alleges no facts in this case suggesting that USPS should have known that Mr. Dunbebin was not acting on behalf of DPC when he asked USPS to terminate the Original

[5] On the other hand, if DPC were to argue that Mr. Dunbebin lacked authority to act for DPC in April 2002, then no valid contract ever would have existed between the parties.

Agreement. Indeed, DPC concedes that, in May 2002, when Mr. Dunbebin terminated DPC's Original ICM Agreement with USPS, he continued to hold himself out as acting on behalf of DPC. See Def. Exh. 8 (TRO Tr. 12:4-11; 31:2-6); Pl. Exh. 4 at ¶ 8 (DPC's state court complaint). When, as in this case, "a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority." See Restatement (Third) of Agency § 3.03 cmt. b (2006); see also Brunner, 70 Fed. Cl. at 628 (noting that "when a principal is responsible for the appearance of an agent's authority, a third party aware of this appearance may rely on it").

Moreover, during the two year period following the termination of the Original Agreement – from May 2002 until May 2004 – DPC never informed USPS that the amendment to the Original ICM Agreement was invalid. USPS received no shipping volume from DPC during this two year period and, therefore, had no reason to believe that anything putatively improper had occurred. See Def. Exh. 10 (May 11, 2005 Letter from M. Plunkett to W. Olson) at 2. By failing to inform USPS of Mr. Dunbebin's allegedly unauthorized amendment to the Original ICM Agreement, DPC bears responsibility for USPS's belief that Mr. Dunbebin had authority to act on behalf of DPC. See Restatement (Third) of Agency § 3.03 cmt. b (2006) ("[a] principal's inaction creates apparent authority when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's representations or actions").

Because Mr. Dunbebin had authority to act for DPC when it entered into the Original

ICM Agreement, USPS had no obligation to inquire into the scope of Mr. Dunbebin's authority when he notified USPS that DPC wanted to terminate the Original ICM Agreement. If Mr. Dunbebin, in fact, no longer had authority to act for DPC, then DPC had an obligation to inform USPS of the changed circumstances. See Restatement (Third) of Agency § 3.03 cmt. b (2006) (principal may be estopped "from denying the agent's authority . . . if the principal is responsible for the agent's representation, typically because the principal did not exercise reasonable care to prevent the agent from making the representation or to inform the third party of its falsity").

Finally, DPC concedes that Mr. Dunbebin defrauded both DPC and USPS by terminating the Original ICM Agreement, and by signing a new ICM agreement with USPS on behalf of AMS. Compl. at ¶ 10; Pl. Exh. 2 at 2; Def. Exh. 8 (TRO Tr. 12:8-11; 95:14-25; 96:1-4; 96:11-15 (Mr. Scarlett admits that USPS was defrauded by Mr. Dunbebin's misrepresentations)); see also Def. Exh. 8 (TRO Tr. at Tr. 100:16-19; 104:21-23; 108:4-5 (district court noting that USPS is innocent and is a victim of fraud)). Thus, whatever Mr. Dunbebin's liability may be to DPC, USPS cannot be held responsible for DPC's putative losses in this case, and DPC remains bound by Mr. Dunbebin's modification to the Original ICM Agreement. See United States v. Gil, 657 F.2d 712, 715 (5th Cir. 1981) (citing United States v. Sanchez, 521 F.2d 244, 246 (5th Cir. 1975), for the proposition that under "federal common law a principal can be held liable for even fraudulent acts of its agents if the agent had apparent authority").

Accordingly, the United States is entitled to summary judgment on both counts of DPC's complaint in this case.

II. Count II Of DPC's Complaint In This Case, Alleging Breach Of The Implied Covenant Of Good Faith And Fair Dealing, Should Be Dismissed

Because the district court dismissed DPC's claim for breach of the implied covenant of good faith and fair dealing, the doctrine of res judicata precludes DPC from relitigating this claim (Count II in this case), before this Court.[6] Alternatively, Count II should be dismissed because it essentially asserts a tort claim that is not within this Court's jurisdiction. Finally, even if the Court possesses jurisdiction, Count II fails to allege sufficient facts to survive a motion to dismiss pursuant to RCFC 12(b)(6).

A. The Doctrine Of Res Judicata Bars Count II Of DPC's Complaint

A claim preclusion defense appropriately is considered as a motion to dismiss pursuant to RCFC 12(b)(6). See Lyons v. United States, 45 Fed. Cl. 399, 402 (1999); see also Burnett v. United States, 40 Fed. Cl. 806, 809 (1998). Res judicata, also known as claim preclusion, "'provides that when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy . . . .'" Montego Bay Imports, Ltd. v. United States, 25 Cl. Ct. 639, 648-49 (1992) (quoting Magnus Electr., Inc. v. La Republica Argentina, 830 F.2d 1396, 1400 (7th Cir. 1987) (internal quotes omitted)). The doctrine is used to "strengthen judgments and accord legitimacy to this nation's judicial system." Lyons v. U.S., 45 Fed. Cl. at 402. Courts routinely use res judicata to "bar litigation in a second action where the matter has previously been adjudicated upon the merits." Id.; see also Dachman v. United States, 73 Fed.

[6] In Count II of DPC's complaint, DPC alleges that USPS breached the implied covenant of good faith and fair dealing by failing to prevent the allegedly improper transfer of the Original ICM Agreement to AMS, by failing to correct that transfer, and by failing to terminate AMS's ability to use the ICM after USPS allegedly discovered that AMS did not comply with the USPS qualifications for such an agreement. Compl. at ¶ 40.

Cl. 508, 522 (2006) (noting that a final judgment on the merits bars further claims by parties based on the same cause of action).

A finding of res judicata requires that: "(1) the court's prior decision must be a valid and final judgment, (2) the suit before the court must involve the same claim or cause of action as in the prior decision, (3) the prior decision must have been made on the merits of the case, and (4) the same parties must be involved in both cases." Lyons, 45 Fed. Cl. at 403. DPC is precluded from relitigating Count II of its complaint in this Court because all four elements of res judicata are satisfied.

The issue of DPC's ability to establish a valid claim for breach of an implied covenant of good faith and fair dealing previously has been decided, on the merits, by the district court. That court, prior to transferring the case here, held, as a matter of law, that DPC's claim for breach of an implied covenant of good faith and fair dealing is a tort claim. See Def. Exh. 9 (Mot. Tr. 11:5-12; 12:3-25; 13:3-14; 14:6-15; 14:20-23; 35:5-12; 35:23-25; 36:1-5). The district court then transferred only DPC's breach of contract claim to this Court but dismissed the tort claim because DPC failed to state a tort claim, under the FTCA, upon which relief may be granted. See id. (Mot. Tr. 35:5-25; 36:1-25; 37:1-2). The district court concluded that no contractual or regulatory provisions give rise to the types of (tort) duties that DPC alleged that USPS breached. Id. at 36:7-10. The court likewise held that Maryland law does not recognize a tort action for merely economic loss unless there has been some risk of personal injury. Id. at 36:1-5. Finally, this case involves the same parties as DPC's action before the district court.

To be clear, DPC does not raise any new claims before this Court. We note that the underlying rationale for the doctrine of res judicata is "to encourage reliance on judicial

decisions, prevent vexatious litigation, and permit courts to resolve other pending suits being litigated for the first time." Montego Bay Imports, 25 Cl. Ct. at 649. That logic applies with full force when, as in this case, the facts and claim presented in DPC's Count II are identical to those raised in the same claim litigated before the district court. As such, DPC has had a full and fair opportunity to litigate what the district court found to be a tort claim, and DPC should be barred from relitigating that cause of action as a contract claim before this Court. See Montego Bay Imports, 25 Cl. Ct. at 650 (res judicata prevented plaintiff from establishing subject matter jurisdiction under the Tucker Act when a court previously had held plaintiff's claim sounded in tort); Franklin Savings Corp., v. United States, 56 Fed. Cl. 720, 738 (2003) (granting defendant summary judgment as to plaintiff's breach of covenant of good faith and fair dealing claim when plaintiff simply had alleged issues previously adjudicated); Naylor v. United States, 53 Fed. Cl. 172, 176-77 (2002) (holding res judicata bars relitigation of identical claims when party had a full and fair opportunity to litigate the adjudicated claims).

B. In The Alternative, Count II Should Be Dismissed Because This Court Lacks Jurisdiction Over Tort Claims

As the party invoking the jurisdiction of this Court, DPC bears the burden of demonstrating that the Court has the requisite subject matter jurisdiction to grant the relief plaintiff requests. Gibbs v. Buck, 307 U.S. 66, 72 (1939); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936). To establish the Court's jurisdiction, plaintiff must demonstrate a waiver of the United States' sovereign immunity. F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). The Government is immune from suit except to the extent that it has expressly consented to be sued. United States v. Sherwood, 312 U.S. 584, 586 (1941). It is axiomatic that when the United States has not consented to suit, dismissal of the action is required. Gilbert v.

DaGrosa, 756 F.2d 1455, 1458 (9th Cir. 1985).

Moreover, it is a well-established principle that "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. King, 395 U.S. 1, 4 (1969)). The Court of Federal Claims is a court of limited jurisdiction. Jentoft v. United States, 450 F.3d 1342, 1349 (Fed. Cir.2006) (citing United States v. King, 395 U.S. 1, 3 (1969)). Pursuant to the Tucker Act, 28 U.S.C. § 1491, this Court may "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Thus, the Tucker Act's jurisdictional grant does not extend to cases sounding in tort. See Keene Corp. v. United States, 508 U.S. 200, 214 (1993); Jentoft, 450 F.3d at 1349-50; Edelmann v. United States, 76 Fed. Cl. 376, 380 (2007); Dachman, 73 Fed. Cl. at 519 (citing McCauley v. United States, 38 Fed. Cl. 250, 264 (1997), aff'd, 152 F.3d 948 (Fed. Cir. 1998) (noting that the United States District Courts are granted exclusive jurisdiction to hear tort claims under the FTCA)).

The gravamen of DPC's second count is that USPS breached the implied covenant of good faith and fair dealing by effectively transferring DPC's ICM agreement to AMS, allegedly contrary to USPS regulations.[7] See Compl. at ¶ 40. Not only has the district court already found that such allegations constitute a tort claim, but also, prior to the district court's transfer of this case to this Court, DPC conceded that Count II was a tort claim. See Def. Ex. 9 (Mot. Tr. 16:5-8). Moreover, DPC must view Count II as sounding in tort, considering that DPC originally

---

[7] As explained above, however, USPS did not transfer DPC's ICM agreement to AMS. Rather, USPS terminated that agreement – at the request of DPC's authorized representative, Mr. Dunbebin – and executed a new ICM agreement with AMS.

filed that claim in district court under the FTCA. See Def. Exh. 5.

DPC cannot create jurisdiction in this Court simply by labeling a tort claim as a breach of contract claim. See Dachman, 73 Fed. Cl. at 518 (dismissing for lack of jurisdiction plaintiff's action for damages sustained from allegedly fraudulent, negligent, or wrongful actions by government employees because, although in some instances styled as "fraudulent breach of contract" claims, plaintiff's claims sounded in tort). Additionally, "[t]he fact that plaintiff[] do[es] not label [its] claim as one sounding in tort is irrelevant. This court is not bound by labels selected by the parties to characterize their action." Adams v. United States, 20 Cl. Ct. 132, 135-36 (1990) (holding that the "gravamen of plaintiffs' complaint" states a cause of action "that sounds in tort" and dismissing complaint for lack of subject matter jurisdiction); see also Montego Bay Imports, 25 Cl. Ct. at 655 (holding that the underlying claim was a tort, regardless of how a party characterizes the claim).

C. Even If Res Judicata Does Not Preclude Count II, And Assuming Count II Is Within This Court's Jurisdiction, This Court Nevertheless Should Dismiss That Count Because It Fails To State A Claim Upon Which Relief Can Be Granted

Alternatively, if this court determines that DPC's claim for breach of the implied covenant of good faith and fair dealing is a contract claim within this court's jurisdiction, and is not barred by res judicata, this Court still should dismiss that claim because DPC has failed to state a claim upon which relief can be granted. In the recent case of Bell Atlantic Corp. v. Twombly, -- U.S. --, 127 S. Ct. 1955 (2007), the Supreme Court held "there is no need to pile up further citations to show that Conley's 'no set of facts' language has been questioned, criticized, and explained away long enough" and that "a wholly conclusory statement of claim would [not] survive a motion to dismiss" simply "whenever the pleadings left open the possibility that a

plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." 127 S. Ct. at 1968-69 (discussing Conley v. Gibson, 355 U.S. 41 (1957), and concluding that it stands for only the proposition that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint"). In sum, "[c]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." McAfee v. United States, 46 Fed. Cl. 428, 437 (2000).

In this case, DPC fails to allege any facts to support its claim for breach of the obligation of good faith and fair dealing inherent in every agreement. Thus, although we agree that "[t]he obligation of good faith and fair dealing is implied in every contract with the Government," Pratt v. United States, 50 Fed. Cl. 469, 478 (2001) (citing Maxima Corp. v. United States, 847 F.2d 1549, 1556-57 (Fed. Cir. 1988)), "[t]he obligation is not ethereal; it must attach to a specific, substantive obligation, mutually assented to by the parties." 50 Fed. Cl. at 478-79 (citing State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997)).

Moreover, the Federal Circuit has found that, because government officials are presumed to act in good faith in the discharge of their duties, a plaintiff's burden of proof is exceedingly stringent. Spezzaferro v. FAA, 807 F.2d 169, 173 (Fed. Cir. 1986). Accordingly, "[t]o prevail on a claim for breach of good faith and fair dealing, a plaintiff must allege and prove facts constituting a specific intent to injure plaintiff on the part of a government official." Pratt, 50 Fed. Cl. at 478 (emphasis added) (noting that on "summary judgment the court therefore must examine the record for evidence of malice or intent to injure plaintiff as demonstrated by specific acts of bad faith."); Detroit Housing Corp., v. United States, 55 Fed. Cl. 410, 417 (2003) (citing

Torncello v. United States, 231 Ct. Cl. 20, 47 (1982), and explaining that, to satisfy the high burden of proof, plaintiff must present "well-nigh irrefragable proof" that the government acted in bad faith).

Count II fails to state a claim upon which relief can be granted because DPC alleges only that USPS violated the implied covenant by failing to prevent the so-called transfer of an ICM agreement to AMS. Compl. at ¶ 40. However, even if Mr. Dunbebin lacked apparent authority, which he did not, and even if the Government breached its agreement with DPC by terminating the Original ICM Agreement, which it did not, Count II of DPC's complaint still fails as a matter of law because DPC does not identify a specific, substantive obligation in the contract mutually assented to by the parties that contains either an express or implied obligation on the part of USPS not to enter into ICM agreements with other mail consolidators. Nor, for that matter, does DPC's Original ICM Agreement contain any obligation that requires USPS to enter into ICM agreements only with companies that meet specific criteria.

DPC does not allege that it had an exclusive ICM agreement with USPS. While Article 20 of the Original ICM Agreement does preclude the rights of either party, under that agreement, from being assigned or transferred to any other person, firm, or corporation without the other party's prior, express, and written consent, nothing in the Original ICM Agreement prevents USPS from entering into ICM agreements with DPC competitors. See Pl. Exh. 1. USPS, therefore, did not breach an implied covenant of good faith and fair dealing simply by terminating the Original ICM Agreement at Mr. Dunbebin's request, or by signing another ICM agreement with AMS.

Finally, even if USPS somehow did "transfer" improperly the Original Agreement from DPC to AMS, DPC still does not allege facts constituting specific intent, on part of USPS, to injure DPC. In fact, DPC admits that USPS, like DPC, was a victim of Mr. Dunbebin's fraud. Def. Exh. 8 (TRO Tr. 12:8-11; 95:14-25; 96:1-4; 96:11-15). Because DPC does not allege that USPS was aware of Mr. Dunbebin's lack of authority, there can be no allegation of any bad faith action taken by USPS. In the absence of any specific allegations that USPS acted with malice or intent to injure DPC by particular acts, Count II must be dismissed as a matter of law. Detroit Housing Corp., v. United States, 55 Fed. Cl. 410 (2003) (citing Torncello v. United States, 231 Ct. Cl. 20, 47 (1982)).

**CONCLUSION**

For all of the above reasons, we respectfully request this Court to grant summary judgment to the United States on Counts I and II of the complaint and, in the alternative, to dismiss Count II of the complaint pursuant to RCFC 12(b)(6) or 12(b)(1).

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

s/ Matthew H. Solomson
MATTHEW H. SOLOMSON
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3274

March 31, 2008

Counsel for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| Distribution Postal Consultants, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-17C |
| | ) | (Judge Bruggink) |
| v. | ) | |
| | ) | |
| The United States, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S EXHIBIT LIST

| Exhibit # | Exhibit Name |
|---|---|
| | |
| Exhibit 1 | Excerpts from May 30, 2002 ICM Agreement between USPS and AMS |
| Exhibit 2 | Excerpts from 2004 ICM Agreement between USPS and DPC (the "Second ICM Agreement") |
| Exhibit 3 | Excerpts from 2006 ICM Agreement between USPS and DPC (the "Third ICM Agreement") |
| Exhibit 4 | December 1, 2006 Letter from M. Plunkett (Manager Pricing Strategy, USPS) to L. Haber, Jr. (President/CEO, DPC) DATED |
| Exhibit 5 | DPC's Complaint in DPC, Inc. v. United States Postal Service, Civ. No. RDB-07-0200 (D. Md. 2007) |
| Exhibit 6 | January 26, 2007 Order, DPC, Inc. v. United States Postal Service, Civ. No. RDB-07-0200 (D. Md. 2007) |
| Exhibit 7 | June 4, 2007 Order, in DPC, Inc. v. United States Postal Service, Civ. No. RDB-07-0200 (D. Md. 2007) (dismissing Counts II and III of DPC's Complaint, and transferring case to United States Court of Federal Claims) |
| Exhibit 8 | Excerpts from January 25, 2007 Temporary Restraining Order Hearing before Judge Quarles, Jr., DPC, Inc. v. United States Postal Service, Civ. No. RDB-07-0200 (D. Md. 2007) |
| Exhibit 9 | Excerpts from June 4, 2007 Motions Hearing before Judge Bennett, DPC, Inc. v. United States Postal Service, Civ. No. RDB-07-0200 (D. Md. 2007) |
| Exhibit 10 | May 11, 2005 Letter from M. Plunkett to W. Olson |

# EXHIBIT 1

ORIGINAL

***INTERNATIONAL CUSTOMIZED MAIL SERVICE AGREEMENT BETWEEN THE UNITED STATES POSTAL SERVICE AND AMERICAN MAIL SORT***

This Agreement is between the United States Postal Service, an independent establishment of the United States Government, and American Mail Sort with offices at 7914 East Baltimore Street, Baltimore, MD 21224-2010.

**ARTICLE 1. PURPOSE OF THE AGREEMENT**
This Agreement shall govern the use American Mail Sort shall have of International Customized Mail service for International Priority Airmail, International Surface Air Lift, and Global Bulk Economy.

**ARTICLE 2. DEFINITIONS**
As used in this Agreement:

1. "United States" means the United States of America, its territories and possessions.
2. "USPS" means the United States Postal Service.
3. "Mailer" means American Mail Sort with offices at 7914 East Baltimore Street, Baltimore, MD 21224-2010.
4. "DMM" means the *Domestic Mail Manual* as published by the USPS from time to time.
5. "IMM" means the *International Mail Manual* as published by the USPS from time to time.
6. "ICM" means International Customized Mail, the bulk mailing system created by this Agreement, pursuant to which the USPS shall accept mail from the Mailer for international delivery.
7. "ICM Mail" means mail the Mailer tenders to the USPS pursuant to this Agreement.
8. "IPA" means International Priority Airmail Service as described in IMM 292.
9. "ISAL" means International Surface Air Lift Service as described in IMM 293.
10. "GBE" means Global Bulk Economy.
11. "ISC" means an International Service Center.
12. "Qualifying Mail" means ICM Mail that meets the requirements set forth in Article 3 of this Agreement.
13. "Non-Qualifying Mail" means ICM Mail that does not meet the requirements set forth in Article 3 of this Agreement.

ORIGINAL

In witness whereof, each party to this Agreement has caused it to be executed as indicated below.

**ON BEHALF OF THE UNITED STATES POSTAL SERVICE:**

Signature: [signature]

Name: John Alepa

Title: Manager, International Finance and IBIS

Date: 5-30-02

**ON BEHALF OF AMERICAN MAIL SORT:**

Signature: [signature]

Name: Robert Dunbebin

Title: President

Date: 5/30/02

# EXHIBIT 2

# *INTERNATIONAL CUSTOMIZED MAIL SERVICE AGREEMENT BETWEEN THE UNITED STATES POSTAL SERVICE AND DISTRIBUTION POSTAL COMPANY*

This Agreement is between the United States Postal Service, an independent establishment of the United States Government, and Distribution Postal, Company.

## ARTICLE 1. PURPOSE OF THE AGREEMENT

This Agreement shall govern the use Distribution Postal Company shall have of International Customized Mail service for International Priority Airmail, International Surface Air Lift, Global Bulk Economy service, and International M-bag service.

## ARTICLE 2. DEFINITIONS

As used in this Agreement:

1. "USPS" means the United States Postal Service.
2. "Mailer" means Distribution Postal Company, its subsidiaries and agents.
3. "DMM" means the *Domestic Mail Manual* as published by the USPS from time to time.
4. "IMM" means the *International Mail Manual* as published by the USPS from time to time.
5. "ICM" means International Customized Mail, the bulk mailing system created by this Agreement, pursuant to which the USPS shall accept mail from the Mailer for international delivery.
6. "IPA" means International Priority Airmail service.
7. "ISAL" means International Surface Air Lift service.
8. "GBE" means Global Bulk Economy service.
9. "United States" means the United States of America, its territories and possessions.
10. "Qualifying Mail" means mail that meets the requirements set forth in Article 3 of this Agreement.
11. "Non-Qualifying Mail" means mail that does not meet the requirements set forth in Article 3 of this Agreement.

## ARTICLE 11 SUSPENSIONS OF MAIL SERVICE

In the event that a suspension of mail service from the United States to a given country would prevent delivery of Qualifying Mail to addressees in that country, the Mailer shall not tender Qualifying Mail to the USPS until service is restored. Under these circumstances, the Mailer shall have the option to make alternative arrangements for the delivery of Qualifying Mail without penalty.

## ARTICLE 12 TERM OF THE AGREEMENT

1. This Agreement shall be in effect from August 14, 2004 and shall remain in effect until midnight on December 31, 2005.
2. Either party to this Agreement may cancel this Agreement by giving the other party six (6) months notice in writing. If the Mailer cancels this Agreement before the stated termination date, the Mailer remains bound by the terms of Article 9.

## ARTICLE 13. LIMITATION OF LIABILITY

The liability of the USPS under this Agreement shall be limited to the refund of postage for Qualifying Mail that is lost or destroyed in bulk after being tendered to the USPS and prior to being received by the delivery authority outside of the United States. The USPS shall not be liable for any actual or consequential damages suffered by the Mailer as the result of late delivery or non-delivery of Qualifying Mail.

## ARTICLE 14. INDEMNITY

The Mailer shall indemnify and save harmless the USPS and its officers, agents, and employees from any and all claims, losses, costs, damages, or expenses growing out of, or connected in any other way with the discharge by the Mailer of any undertaking contained in this Agreement, except for Claims arising out of the negligence or willful misconduct of the USPS or of its officers, agents, or employees. Notwithstanding its obligation to indemnify the USPS, the Mailer shall not be liable for any consequential damages suffered by the USPS.

## ARTICLE 15. FORCE MAJEURE

Neither party shall be liable for its failure to perform under the terms of this Agreement due to any contingency beyond its reasonable control, including acts of God, fires, floods, wars, sabotage, accidents, labor disputes or shortages, governmental laws, ordinances, rules and regulations, whether valid or invalid, court orders, whether valid or invalid, inability to obtain material, equipment, or transportation, and any other similar or different contingency.

## ARTICLE 22. NUMBER AND GENDER

The use of any particular gender or the plural or singular number in this Agreement is intended to include the other gender or number as the text may require.

## ARTICLE 23. PARAGRAPH HEADINGS

The titles to the paragraphs of this Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Agreement.

## ARTICLE 24. NOTICES

All notices or demands required by this Agreement shall be sufficient if delivered personally or mailed to the following individuals:

**To the United States Postal Service:**

United States Postal Service
Vice President, International Business
475 L'Enfant Plaza SW
Washington, DC 20260-9998

**To the Mailer:**

Louis F. Haber, Jr.
President/CEO
Distribution Postal Company
6200 Frankford Avenue
Baltimore MD 21206-4902

In witness whereof, each party to this Agreement has caused it to be executed as indicated below.

**ON BEHALF OF THE UNITED STATES POSTAL SERVICE:**

Signature: /s/

Name: Michael Plunkett

Title: Manager, Pricing Strategy

Date: ______

**ON BEHALF OF DISTRIBUTION POSTAL COMPANY:**

Signature: /s/

Name: ______

Title: ______

Date: ______

# EXHIBIT 3

ORIGINAL

### *INTERNATIONAL CUSTOMIZED MAIL SERVICE AGREEMENT BETWEEN THE UNITED STATES POSTAL SERVICE AND DISTRIBUTION POSTAL COMPANY*

This Agreement is between the United States Postal Service, an independent establishment of the United States government, and Distribution Postal Company

**ARTICLE 1. PURPOSE OF THE AGREEMENT**
This Agreement shall govern the use Distribution Postal Company shall have of International Customized Mail service for International Priority Airmail (IPA), International Surface Air Lift service (ISAL), Global Express Mail™ (EMS), International M-bags, Global Bulk Economy service, and Global Direct service.

**ARTICLE 2. DEFINITIONS**
As used in this Agreement:

1. "USPS" means the United States Postal Service.
2. "Mailer" means Distribution Postal Company, 6200 Frankford Ave., Baltimore, MD 21206-4902, its subsidiaries and agents.
3. "DMM" means the *Domestic Mail Manual* as published by the USPS from time to time.
4. "IMM" means the *International Mail Manual* as published by the USPS from time to time.
5. "ICM" means International Customized Mail, the bulk mailing system created by this Agreement, pursuant to which the USPS shall accept mail from the Mailer for international delivery.
6. "IPA" means International Priority Airmail service.
7. "ISAL" means International Surface Air Lift service.
8. "M-bags" means special sacks for printed matter directed to a single address in another country.
9. "EMS" means Global Express Mail™ (EMS) service.
10. "GBE" means Global Bulk Economy service.
11. "Global Direct" means mail tendered in the United States bearing the postage indicia of a foreign country and entered directly in to the domestic mail stream of that country.
12. "United States" means the United States of America, its territories and possessions.
13. "Qualifying Mail" means ICM Mail that meets the requirements set forth in Article 3 of this Agreement.
14. "Non-Qualifying Mail" means ICM Mail that does not meet the requirements set forth in Article 3 of this Agreement.

ORIGINAL

**Exhibit 9.3**

| Annual IPA, ISAL, GBE, M-bag, and Global Direct Revenue* | Percentage Discount For IPA Rate Group 4 |
|---|---|
| $ 2,000,000 - $ 9,999,999 | 3.00% |
| $ 10,000,000 - $ 14,999,999 | 6.00% |
| $ 15,000,000 - $ 24,999,999 | 9.00% |
| $25,000,000 and over | 12.00% |

* Actual revenue received after discount is applied.

## ARTICLE 10. MODIFICATION OF POSTAGE RATES

1. In the event that the cost for providing any one of the categories of Qualifying Mail increases in excess of five (5) percent, the USPS reserves the right to notify the Mailer and modify the rates for that service established under this Agreement.
2. The rates in Exhibits 8.5.1, 8.5.2, and 8.5.3 are based on Canada Post Corporation rates. The USPS reserves the right to modify these rates if Canada Post Corporation changes its rates during the term of this Agreement.
3. The rates in Exhibits 8.5.1, 8.5.2, and 8.5.3 are based on the one-year forward exchange rate reported in the Financial times on October 4, 2005. The USPS will review the foreign exchange rate on the first business day of the second, third, and forth calendar quarter. Should the rates in Exhibits 8.5.1, 8.5.2, and 8.5.3 fall below the Canadian domestic rates as expressed in US dollars, the USPS reserves the right to modify the rates in Exhibits 8.5.1, 8.5.2, and 8.5.3 based upon the exchange rate reported in the Financial Times on those dates.

## ARTICLE 11. NO SERVICE GUARANTEE

Nothing in this Agreement shall be construed as a representation or guarantee by the USPS that Qualifying Mail will be delivered to the appropriate addressees within any particular time.

## ARTICLE 12. TERM OF THE AGREEMENT

1. This Agreement shall be in effect from January 8, 2006 and shall remain in effect until midnight on December 31, 2006.
2. Either party to this Agreement may cancel this Agreement by giving the other party six (6) months notice in writing. If the Mailer cancels this Agreement before the states termination date, the Mailer remains bound by the terms of Article 9.

## ARTICLE 13. GOVERNING LAW

This Agreement shall be governed by, construed, and enforced in accordance with United States federal law.

ORIGINAL

## ARTICLE 25. NOTICES

All notices or demands required by this Agreement shall be sufficient if delivered personally or mailed to the following individuals:

**To the United States Postal Service:**

Vice President, Pricing and Classification
United States Postal Service
Room 5014
475 L'Enfant Plaza, SW
Washington, DC 20260-5014

**To the Mailer:**

Louis F. Haber, Jr.
President/CEO
Distribution Postal Company
6200 Frankford Avenue
Baltimore, MD 21206-4902

---

In witness whereof, each party to this Agreement has caused it to be executed as indicated below.

**ON BEHALF OF THE UNITED STATES POSTAL SERVICE:**

Signature: [signature]

Name: Michael Plunkett

Title: Manager, Pricing Strategy

Date: 12-20-05

**ON BEHALF OF DISTRIBUTION POSTAL COMPANY:**

Signature: L. F. Haber Sr.

Name: Louis F. Haber

Title: Director

Date: Dec. 21, 2005

# EXHIBIT 4

PRICING STRATEGY

UNITED STATES
POSTAL SERVICE

December 1, 2006

Mr. Louis F. Haber, Jr.
President / CEO
Distribution Postal Company
6200 Frankford Avenue
Baltimore, MD 21206-4902

Dear Mr. Haber:

This is in regard to the International Customized Mail (ICM) Service Agreement between the United States Postal Service (USPS) and Distribution Postal Company.

Article 9 of the ICM Service Agreement in effect from August 14, 2004 through midnight on January 7, 2006 reads as follows:

> "If the Mailer does not tender to the USPS international mail intended for delivery outside the United States that generates at least $25 million in actual postage on an annualized basis beginning on the effective date of this Agreement as defined in Article 12 and ending on the termination date of this Agreement, the Mailer must reimburse the USPS the amount of the additional discount it received above the discount earned subject to the Agreement in accordance with Exhibits 1, 2, 3, 4, and 5."

Our records indicate that Distribution Postal Company did not mail at least $25 million in actual postage under the terms of the ICM Agreement. The USPS has invoiced Distribution Postal a total of $136,571.00 for reimbursement of postage under the terms of Article 9. However, to date, the USPS has not received payment. Consequently, the USPS will not enter into a new ICM Service Agreement with Distribution Postal Company when the present ICM Service Agreement expires on January 14, 2007.

Sincerely,

Michael Plunkett
Manager Pricing Strategy

ED980947020US

cc: Francine Moore

475 L'Enfant Plaza, SW
Washington, DC 20260-3658

TEL: 202-268-7283
FAX: 202-268-4966

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern District)

| | | |
|---|---|---|
| DISTRIBUTION POSTAL CONSULTANTS, INC.<br>6200 Frankford Ave.<br>Baltimore, Maryland 21206<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE<br>475 L'Enfant Plaza, S.W.<br>Washington, D.C. 20260<br><br>Serve On:<br>William T. Alvis, Esquire<br>United State Postal Service<br>475 L'Enfant Plaza, S.W.<br>Washington, D.C. 20260<br><br>Defendant. | * * * * * * * * * * * | Case No. |

* * * * * * * * * * * * * *

COMPLAINT

Distribution Postal Consultants, Inc., Plaintiff, by its attorneys, Robert B. Scarlett and Scarlett & Croll, P.A., sues the United States Postal Service, Defendant and in support of this suit respectfully states:

Parties

1. Distribution Postal Consultants, Inc., a/k/a Distribution Postal, Inc., Plaintiff, is a Maryland corporation.

2. The United States Postal Service, Defendant, is an agency of the United States Post Office which does business in the State of Maryland.

Jurisdiction

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1339, in

that this matter relates to the postal service.

## Facts Common to All Counts

4. Plaintiff is in the business (the "Business") of producing, servicing and managing mail for its customer base for the purposes of sending mail throughout the country and throughout the world in the most economic manner.

5. For over twenty (20) years, Plaintiff or its predecessor has dealt with the Defendant and has entered into numerous agreements with the Defendant for postal discounts on its mailing services, which discounts it passes along to its customer base, thus providing a service to its customers which permits its customers to mail, both domestically and internationally, its letter and packages for a postal rate less than the Defendant's normal postal rate.

6. By providing this postal service, Plaintiff produces millions of dollars of mail for Defendant Plaintiff, thus benefitting and profiting the Defendant. For example, from January 1, 2006 to December 31, 2006, Plaintiff produced for the Defendant international postal revenue in excess of $23,000,000.00 and $10,000,000.00 of domestic postal revenue.

7. An important and vital part of Plaintiff's business operations is its international mail service, which comprises about fifty percent (50%) of the Plaintiff's total sales and is the Plaintiff's most profitable area of business; the Plaintiff's business will not survive if does not maintain its postal discounts on international mail as currently being provided to it by the Defendant.

8. Pursuant to Plaintiff's international mail service, Plaintiff received, on April 2, 2002, from the Defendant an International Customized Mail Service Agreement (the "International Mail License"), which permits Plaintiff to mail international mail at a specific percentage discount of sixteen percent (16%), provided that Plaintiff places with Defendant at least $25,000,000.00 of actual postal on an annualized basis. This International Mail License benefits Defendant by guaranteeing Defendant certain revenues from

international postage placed by Plaintiff. A copy of the International Mail License is attached hereto as Exhibit 1 and incorporated herein by reference.

9. Unbeknownst to Plaintiff, but known to Defendant, the International Mail License was transferred to a Maryland corporation, known as American Mail Sort, LLC ("American Mail Sort"), on May 30, 2002.

10. The transfer of Plaintiff's International Mail License to American Mail Sort was done by a fraudulent amendment to the International Mail License, which was submitted to Defendant by a Maryland resident, known as Robert Dunbebin. Defendant, despite its own regulations, did not properly send a copy of the transfer to Defendant.

11.` Unknown to Plaintiff, American Mail Sort and Robert Dunbebin used the International Mail License to improperly divert business from the Plaintiff in a manner which significantly harmed Plaintiff.

12. Around May of 2004, Barry Burns, one of Defendant's international product managers, informed Plaintiff that Plaintiff's license did not exist and had been transferred to American Mail Sort. Plaintiff immediately informed the Defendant of this improper transfer and immediately demanded that the International Mail License bè returned to it in order for it to comply with its obligations under the terms and conditions of the International Customized Mail Service Agreement, which required Plaintiff generate at least $25,000,000.00 of postal revenues.

13. Defendant did not comply with the Plaintiff's request to correct its mistake.

14. Even after the Plaintiff's demand, and after Defendant was aware of the fraudulent activities of American Mail Sort and Robert Dunbebin, Defendant decided to allow American Mail Sort and Robert Dunbebin to continue to use the improperly transferred International Mail License and, instead, issued a new international mail license to the Plaintiff on August 4, 2004.

15. Defendant also continued to allow American Mail Sort and Robert Dunbebin to continue to use the Plaintiff's license, even though American Mail Sort, under the Plaintiff's own criteria, did not qualify

to use an international license of the sort that it was being permitted to use by the Defendant. Defendant continued to allow this improper use of the license by American Mail Sort and Robert Dunbebin even after the Plaintiff continued to complain, that such use was directly interfering with its business and directly interfering with its ability to comply with its requirements under the terms and conditions of the International Mail License Agreement.

16. Defendant's improper action of allowing American Mail Sort to use the international mail license directly caused Plaintiff to fail in its obligations to meet its licensing sales of $25,000,000.00, as required by Defendant in the International Mail License.

17. By letter dated March 21, 2005, Plaintiff's government contracting and postal attorney, William J. Olson, mailed a letter to Defendant's agent Michael K. Plunkett concerning the events involving American Mail Sort (the "Olson Letter"). A copy of the Olson Letter is attached hereto as Exhibit 2 and incorporated herein by reference.

18. Besides setting forth the facts of American Mail Sort's and Robert Dunbebin's improper use of Plaintiff's International Mail License, the Olson Letter attaches certain regulations (the "Regulations") of the Defendant which Defendant violated in allowing American Mail Sort to use the international mail license. Page 3 of the Olson Letter states:

> Section 623.2.a. expressly provides, for example, that the company applying for Postal Qualified Wholesaler status "[m]ust have a minimum of one year of experience as an international or domestic mail consolidator, presorter, or letter shop." It is our understanding that AMS (American Mail Sort) was newly formed in 2002, and had barely begun operations at the time it was given its ICM (International Customized Mailing Agreement) service agreement by the Postal Service. Accordingly, we would submit that AMS was not a Postal Qualified Wholesaler, and could not possibly have qualified as a Postal Qualified Wholesaler, in May of 2002, and that AMS thus would not have been eligible for the ICM service agreement it was given by the Postal Service in May, 2002. Section 623.2.b. expressly provides that the company "[m]ust have realized at least $1 million in gross international revenues with the Postal Service in the most recent calendar year for services it provided in connection with mail that originated in the United States." Again, AMS could not possibly have made such a showing. Based upon these facts alone, and even without seeing the AMS application form, there would appear to have been no legitimate reason that would support the Postal Service's acceptance of AMS as a Postal Qualified Wholesaler, and thus no basis for issuance of an ICM service agreement to AMS in May 2002. We are not

certain, of course, concerning all of the reasons for why the action that was taken actually occurred, but there is clear evidence that it should not have occurred.

19. Besides identifying that Defendant had breached its own regulation, i.e. Section 623.2, what is interesting about the Olson Letter is the fact that within three months of receiving the Olson Letter, Defendant changed its regulations in a manner which would permit American Mail Sort to obtain the international mail license.

20. To rectify this problem, and in recognition of the failure of Defendant to solve the problem after being informed of the improper use of the international mail license, Plaintiff filed suit against Robert Dunbebin and American Mail Sort on October 12, 2004, in the Circuit Court for Baltimore City (Civil No. 4-C-04-007557).

21. On December 12, 2005, Plaintiff received a judgment (the "Judgment") from the Circuit Court against American Mail Sort and Robert Dunbebin, jointly and severally, in the amount of $755,197.21, plus $10,000,000.00 in punitive damages, for a total of $10,755,197.21. A copy of the Judgment is attached hereto as Exhibit 3 and incorporated herein by reference.

22. Plaintiff's vice president, Louis F. Haber, Sr., immediately faxed a copy of the Judgment to Defendant so Defendant could comply with the Circuit Court's Order, preventing the continued use by American Mail Sort of the Plaintiff's International Mail License.

23. In addition to the Judgment, and as a result of the Judgment, Plaintiff discovered that American Mail Sort had been committing fraud on Defendant, initiating an investigation by Defendant of American Mail Sort and Robert Dunbebin; Plaintiff has cooperated with Defendant's investigation.

24. As a result of Defendant's improper actions, Plaintiff has been monetarily harmed.

25. Pursuant to the administrative requirements for filing a claim (the "Claim") against Defendant, Plaintiff filed on or about February 27, 2006 a claim for damages, injury or death on Standard

Form 95, as prescribed by the Department of Justice, 11 C.F.R. § 14.2. A copy of the Claim is attached hereto as Exhibit 4 and incorporated herein by reference.

26. By letter dated September 26, 2006, the undersigned attorney received a letter from Wendy Wiedemann Hudson, Attorney for Defendant denying Plaintiff's Claim. A copy of the letter is attached hereto as Exhibit 5 and incorporated herein by reference. In part the letter states:

> In accordance with 28 U.S.C. § 2401(b) and 39 C.F.R. 912.9(a), if dissatisfied with the Postal Service's final denial of an administrative claim, a claimant may file suit in a United States District Court no later than six (6) months after the date the Postal Service mails the notice of that final action. Accordingly, any suit filed in regards to this denial must be filed no later than six (6) months from the date of the mailing of this letter, which is the date shown above. Further, note the United States of America is the only proper defendant in a civil action brought pursuant to the Federal Tort Claims Act and such suit may be heard only by a federal district court.

27. This proceeding is filed within the time prescribed by 28 U.S.C. § 2401(b) and 39 C.F.R. 912.9(a).

28. Plaintiff is a business that employs approximately thirteen to eighteen employees, which will may lose their jobs and be irreparably harmed if Plaintiff is not able to continue to use its International Mail License.

29. Defendant will not renew the License unless the Plaintiff agrees to pay the Defendant approximately $136,000.00, which amount represents the penalty associated with not being able to complete the minimum of $25,000,000.00 in postal revenue sales, as required by the International Mail License.

30. Plaintiff believes, and therefore avers, that it is unfair and unjust to have required Plaintiff to meet its minimum of $25,000,000.00 in postal revenue sales, because it was Defendant's improper actions which caused Plaintiff not to be able to meet this minimum requirement as set forth in the International Mail License.

31. Plaintiff, given normal business circumstances, can meet its requirements of $25,000,000.00 million of annualized postage sales, now that it has had some opportunity to work with its customer base

without the interference of American Mail Sort and the Defendant; however, Defendant has informed Plaintiff it is terminating its ability to use its International Mail License on January 25, 2007.

32. Defendant has already prematurely interfered with the Plaintiff's use of its International Mail License by cutting off its service of the International Mail License improperly within the past two weeks. When Plaintiff asked Defendant why its International Mail License had been prematurely cut off, Defendant informed Plaintiff that all companies with the license had been cut off. Defendant asked postal employees in New York and discovered that the information was inaccurate and it was only Plaintiff's International Mail License which was prematurely cut off.

33. Attached hereto as Exhibit 6, and incorporated herein by reference, is a list of corporations throughout the country who would be directly irreparably harmed by Plaintiff being prohibited by Defendant of its use of the International Mail License, in that these corporations' mail would not be properly serviced by Plaintiff if the International Mail License was terminated.

34. Plaintiff has a contract right and a right to treated in good faith and fair dealing by Defendant, as set forth above and in the International Mail License.

35. Defendant has not complied with its responsibilities and obligations under International Mail License and has not dealt with Plaintiff in good faith and fair dealing to the irreparable damage of Plaintiff.

36. If Defendant is not Ordered by this Court to continue to permit Plaintiff to use its International Mail License, Plaintiff will be irreparably damaged by loss of monies and sale, in a manner which probably will cause Plaintiff to go out of business after serving the business community and Defendant for over twenty-five years.

37. The benefits to Plaintiff in obtaining an injunction are equal to or outweigh the potential harm which Defendant would incur, were the injunction granted.

38. Plaintiff will suffer irreparable injury unless an injunction is granted.

39. The public interest is best served by granting an injunction.

40. As a result of Defendant's actions, Plaintiff has retained the service of James G. Sturgill, CPA, CVA, ABV who analyzed Plaintiff's damages and calculates that Plaintiff was damaged by Defendant in the amount of $1,119,362.00. A copy of Mr. Sturgill's draft report is attached hereto as Exhibit 7 and incorporated herein by reference.

**Count I**

**(Breach of Contract)**

41. Plaintiff incorporates herein, by reference, each and every allegation set forth in the above paragraphs.

42. The International Mail License represents a contractual agreement between the Plaintiff and the Defendant, which the Defendant breached when it improperly transferred the International Mail License to American Mail Sort and, also, after being duly informed of the improper transfer, allowed American Mail Sort to continue utilizing the International Mail License even though American Mail Sort did not qualify for such a international mail license under the Defendant's own criteria and regulations for issuing such a license.

43. As a result of Defendant's breach of contract, Plaintiff has experienced monetary harm and damaged.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a. Enter judgment in its favor of the Plaintiff and against the Defendant in the amount of $1,119,362.00, plus pre-judgment interest and costs of this suit; and

b. Grant such other and further relief as deemed just by this Court.

## Count II

### (Implied Covenants of Good Faith and Fair Dealing)

44. Plaintiff incorporates herein, by reference, each and every allegation set forth in Count I above.

45. In that the International Mail License constitutes a contract between Plaintiff and Defendant, there is a covenant of good faith and fair dealing which is implied in said contract under which Defendant had an obligation to perform its obligations under the contract in good faith and with fair dealing and pursuant to the terms of the International Mail License Agreement.

46. Plaintiff, at all times, performed its obligations, conditions and agreements imposed by the International Mail License in good faith and in fair dealing.

47. Defendant breached the implied covenant of good faith and fair dealing by failing to prevent the improper transfer of the International Mail License to American Mail Sort, by failing to correct the improper transfer of the International Mail License after being duly informed by the Plaintiff, and by failing to terminate American Mail Sort's ability to use the International Mail License when Defendant discovered that the criteria it uses for determining whether a company qualifies for the international mail license had not been complied with by American Mail Sort.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a. Enter judgment in its favor of the Plaintiff and against the Defendant in the amount of $1,119,362.00, plus pre-judgment interest and costs of this suit; and

b. Grant such other and further relief as deemed just by this Court.

## Count III

## (Preliminary Injunction/Temporary Restraining Order)

48. Plaintiff incorporates herein, by referenced, each and every allegation set forth in the counts above.

49. Defendant stated intention to terminate the Plaintiff's International Mail License would be unjust and improper in that it is Defendant's own actions which prevented Plaintiff from complying with the requirements of Defendant to qualify for renewal of the International Mail License. The threatened termination of the International Mail License by the Defendant is endangering the Plaintiff's business and potentially exposing the Plaintiff to unreasonable liability if the International Mail License is terminated and that such termination would prevent the Plaintiff from servicing its client base.

50. If the International Mail License is terminated, thousands of dollars of damage would be incurred by the Plaintiff through such improper termination and the Plaintiff would suffer irreparable harm.

51. Balancing the harm to the Plaintiff, as compared to the harm to the Defendant if the International license was continued indicates that the harm to the Plaintiff far outweighs the harm to the Defendant if this Court determines to grant an injunction continuing the Plaintiff's use of the International Mail License. In fact, Plaintiff believes, and therefore avers, that Defendant would incur no harm if it was directed to allow Plaintiff to continue to use the International Mail License. Instead, Defendant would be benefitted by such action through receipt of increased postal revenue sales.

52. The facts above set forth a case that gives a reasonable probability that Plaintiff will prevail on its action against Defendant and showing that it is Defendant's fault that Plaintiff is not able to comply with its Defendant's requirements for renewing the International Mail Licence.

53. The Plaintiff believes, and therefore avers, that it would be in the public's interest and promote the business of the Plaintiff and its customer base if an Ex Parte Injunction or a Temporary

Restraining Order was granted in order to prevent Plaintiff's International Mail License from being terminated by Defendant.

54. Plaintiff has a contract right and a right to treated in good faith and fair dealing by Defendant, as set forth above and in the International Mail License.

55. Defendant has not complied with its responsibilities and obligations under International Mail License and has not dealt with Plaintiff in good faith and fair dealing to the irreparable damage of Plaintiff.

56. If Defendant is not Ordered by this Court to continue to permit Plaintiff to use its International Mail License, Plaintiff will be irreparably damaged by loss of monies and sale, in a manner which probably will cause Plaintiff to go out of business after serving the business community and Defendant for over twenty-five years.

57. The benefits to Plaintiff in obtaining an injunction are equal to or outweigh the potential harm which Defendant would incur, were the injunction granted.

58. Plaintiff will suffer irreparable injury, loss, or damage will result to Plaintiff, unless the injunction is granted and before Defendant can be heard in opposition.

59. The public interest is best served by granting an injunction.

WHEREFORE, Plaintiff Distribution Postal Consultants, Inc., hereby prays that this Honorable Court:

a. Direct that Defendant, the United States Postal Service, be prohibited from terminating that International Customized Mailing Agreement, which is currently being used by the Plaintiff in its business operations, until further Order of this Court; and

b. Such other and further relief as deemed just by this Court.

**VERIFICATION BY PLAINTIFF'S AGENT**

I do solemnly affirm, under the penalties of perjury, that the contents of the foregoing Complaint are true to the best of my knowledge, information and belief.

/s/ Louis F. Haber
Louis F. Haber, Vice President of
Distribution Postal Consultants, Inc.

Respectfully submitted,

/s/ Robert B. Scarlett
Robert B. Scarlett
Federal Trial No. 01424

SCARLETT & CROLL, P.A.
201 N. Charles Street, Suite 600
Baltimore, MD 21201
(410) 468-3100
Fax (410) 332-4026
RScarlett@ScarlettCroll.com

Attorneys for Plaintiff

**CERTIFICATION OF ATTORNEY PURSUANT TO FEDERAL RULE 65(B)**
**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of January, 2007, I caused a copy of the foregoing Verified Complaint to be faxed, mailed by Federal Express and by first class mail to:

William Alvis, Esquire
Postal Service HQ Corporate Law Attorney
United State Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C. 20260
Fax No. (202) 268 3094

Anthony Alverno, Chief Counsel
Customer Protection & Privacy Law
United State Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C. 20260
Fax No. (202) 268 5418

/s/ Robert B. Scarlett
Robert B. Scarlett

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| DISTRIBUTION POSTAL CONSULTANTS, INC., | * | |
| Plaintiff, | * | CIVIL NO.: RDB-07-0200 |
| v. | * | |
| UNITED STATES POSTAL SERVICE, | * | |
| Defendant. | * | |

* * * * * * * * * * * * *

ORDER

For the reasons discussed during the January 25, 2007 motions hearing, it is, this 26th day of January, 2007, ORDERED that:

1. Distribution Postal Consultants's ("DPC") motion for a preliminary injunction or a temporary restraining order (Paper No. 2) BE, and HEREBY IS, GRANTED;
2. The International Customized Mail Service Agreement between DPC and the United States Postal Service (the "USPS") shall continue for a period not to exceed six months from January 25, 2007;
3. DPC shall, within five days of January 25, 2007, post a bond, cash or corporate surety in the amount of $ 226,571 with the Registry of the Court;
4. DPC shall, within 10 days of January 25, 2007, propose to the Court a schedule for payments to the USPS of a portion

of DPC's proceeds of 2007 postal sales to insure against its inability to pay a potential new penalty based on sales in 2007;

5. The USPS shall have four days to respond to DPC's proposed payment schedule; and

6. The Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.

/s/
William D. Quarles, Jr.
United States District Judge

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DISTRIBUTION POSTAL CONSULTANTS, INC., *

Plaintiff, *

v. * Civil Action No.: RDB 07-200

UNITED STATES POSTAL SERVICE, *

Defendant. *

* * * * * * * * * * * * *

**ORDER**

On June 4, 2007, this action came before this Court for a hearing on the following motions: (1) Motion to Show Cause Why Preliminary Injunction Should Not Be Vacated filed by Defendant (Paper No. 11); (2) Motion to Dismiss filed by Defendant (Paper No. 15); and (3) Motion to Amend Complaint filed by Plaintiff (Paper No. 22). Counsel having been heard and this Court having rendered its ruling for reasons stated on the record, it was this 4th day of June, 2007, ORDERED that:

1. The Motion to Show Cause Why Preliminary Injunction Should Not Be Vacated filed by Defendant (Paper No. 11) is GRANTED and the preliminary injunction ordered by this Court on January 26, 2007 is VACATED;
2. The Motion to Dismiss filed by Defendant (Paper No. 15) is GRANTED-IN-PART and DENIED-IN-PART;
   (a) Defendant's Motion to Dismiss is GRANTED with respect to Counts II and III of the Complaint;
   (b) Defendant's Motion to Dismiss is DENIED with respect to Count I of the Complaint;

3. The Motion to Amend Complaint (Paper No. 22) is DENIED;

4. All further proceedings in this case are transferred to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1631;

5. Copies of this Order shall be transmitted to counsel of record as well as the Clerk of the Court for the United States Court of Federal Claims; and

6. The Clerk of this Court shall CLOSE this case.

Dated: June 4, 2007

/s/
Richard D. Bennett
United States District Judge

# UNITED STATES DISTRICT COURT
OFFICE OF THE CLERK
# DISTRICT OF MARYLAND

Felicia C. Cannon, Clerk

Reply to Northern Division Address

June 4, 2007

U.S. Court of Federal Claims
103 Howard T. Markey National
Courts Building
717 Madison Place, N.W.
Washington, DC 20005

Re: Distribution Postal Consultants, Inc. vs. U.S. Postal Service
Civil Action No.: RDB-07-200

Dear Clerk:

[ x ] On June 4, 2007, an Order was filed transferring the above-captioned case to your Court. Enclosed are certified copies of the Order and docket entries.

[ ] On, an Order was filed accepting jurisdiction by your court in this case. Enclosed are certified copies of the Transfer of Jurisdiction (Prob 22), Indictment, Judgment and Commitment, and docket entries.

[ ] Consent of the Defendant and approval of the United States Attorney having been received, this matter is being transmitted to your Court pursuant to Fed. R. Crim. P. 20(a). Enclosed are all the original papers on file.

Kindly acknowledge receipt of the enclosed on the duplicate copy of this letter and indicate the case number assigned in your District in the area provided below.

Thank you for your cooperation and courtesy in this matter.

Sincerely,

Felicia C. Cannon, Clerk

By: /s/
Holly M. Lee Deputy Clerk

Enclosure

Received by: ______________________
Date: ______________________
New Case No.: ______________________

Letter Transferring Case (Rev. 02/26/2002)

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

DISTRIBUTION POSTAL CONSULTANTS,)( Civil Action No. RDB-07-200
INC., )(
Plaintiff )( Baltimore, Maryland
v. )( January 25, 2007
UNITED STATES POSTAL SERVICE, )( 2:01 p.m.
Defendant )(
--------------------------------)(

THE ABOVE-ENTITLED CASE CAME ON FOR MOTIONS HEARING
BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.,
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

On behalf of the Plaintiff:

ROBERT B. SCARLETT, ESQUIRE

On behalf of the Defendant:

TARRA DeSHIELDS MINNIS, AUSA
ANTHONY F. ALVERNO, ESQUIRE
WILLIAM T. ALVIS, ESQUIRE

Reported by:

Martin J. Giordano, RMR, CRR, FOCR
U.S. Courthouse, Room 3318
101 West Lombard Street
Baltimore, Maryland 21201
410-962-4504

P R O C E E D I N G S

THE CLERK: Please rise. The United States District Court for the District of Maryland is now in session, The Honorable William D. Quarles, Jr. presiding.

THE COURT: Good afternoon. Please be seated.

THE CLERK: The case now pending before the Court is Civil Docket RDB-07-200, Distribution Postal Consultants, Inc., versus The United States Postal Service. The case comes before the Court this afternoon on a Motion for Temporary Restraining Order.

THE COURT: Counsel, please identify yourselves.

MR. SCARLETT: Robert Scarlett on behalf of Distribution Postal Consultants, Your Honor, and to my --

THE COURT: Good afternoon.

MR. SCARLETT: Good afternoon. To my right, I have Louis Haber. He is the vice-president of the company.

THE COURT: Good afternoon.

MR. HABER: Good afternoon, sir.

MS. DeSHIELDS: Tarra DeShields on behalf of The Postal Service, Your Honor, and to my left are William T. Alvis, who is an attorney with the consumer protection privacy law of the Postal Service, and also Anthony Alverno, who is chief counsel of the customs program of the law department of the Postal Service.

THE COURT: Thank you, counsel. Good afternoon.

THE REPORTER: Can you spell that?

MR. SCARLETT: D-U-N-B --

THE COURT: Dunbebin, or --

MR. SCARLETT: Dunbebin.

THE COURT: Dunbebin.

MR. SCARLETT: Dunbebin.

THE COURT: Not a stranger to you all.

MR. SCARLETT: Not a stranger to us, okay, but, unbeknownst --

THE COURT: Had, in fact, signed the original agreement -- the 2002 agreement?

MR. SCARLETT: That's correct, Your Honor.

THE COURT: On behalf of your company, Distribution Postal Consultants?

MR. SCARLETT: Right.

THE COURT: What was his relationship to Distribution Postal Consultants?

MR. SCARLETT: His company teamed up with our company to be able to produce, through his company, American Mail Sort --

THE COURT: No, no. Was he an employee of yours?

MR. SCARLETT: No, he was not an employee.

THE COURT: He signed the year 2002 agreement, though, on behalf of your company, DPC.

MR. SCARLETT: That's correct, Your Honor, but, at

the time that he went back and had the license or agreement transferred to American Mail Sort, he had no authority from our company. He was not acting in that authority, and, in fact, the Circuit Court of Baltimore City, as set forth in our Complaint as an exhibit --

THE COURT: Which you got by default, I understand, so it's not contested, and we learn to distinguish between facts that are established as a result of contested litigation and facts that are essentially conceded as a result of a default, but, be that as it may, again, go back to Mr. Dunbebin. Mr. Dunbebin ended up signing the agreement that I saw attached to the Complaint, and just on behalf of DPC; is that correct?

MR. SCARLETT: That's correct, Your Honor.

THE COURT: And he presumably had authority to do that.

MR. SCARLETT: At that time, he did, Your Honor. In the initial Complaint, he did. We were --

THE COURT: What was his position with DPC?

MR. SCARLETT: He was an authorized agent, and that is it, Your Honor, at that time, for the purposes of signing that agreement.

THE COURT: Okay. And did you transmit that authority to the Postal Service?

MR. SCARLETT: Actually, Your Honor, what appears to

have happened here is that there was more of -- from an agency perspective, I believe, it's more of a ratification.

THE COURT: No, no. I'm not asking that question. I look at the signature page, and it's on behalf of Distribution Postal, signed by Mr. Robert Dunbebin, a Robert Dunbebin, and he's identified on the contract as a VP, which I assume means vice-president of DPC as of April 24th, 2002. So I gather this was the extent of the holding out to the Postal Service. I assume no one showed them an additional letter of authority or anything.

MR. SCARLETT: That's correct, Your Honor.

THE COURT: So he held himself out as a vice-president of Distribution Postal. Was he a vice-president of Distribution Postal?

MR. SCARLETT: It is my understanding he was not a vice-president, but I also want to make it clear to the Court that Distribution Postal is not contesting that he was down there with the authority of Distribution Postal in order to enter into this agreement right here.

THE COURT: He was, in fact, at this point, acting on behalf of Distribution --

MR. SCARLETT: Correct.

THE COURT: -- Postal? Okay. Now, what happened?

MR. SCARLETT: What happened is that later on he then came back to Postal and had, unbeknownst to Mr. Haber and

his son, two owners of the Distribution Postal --

THE COURT: But you believe beknownst to the Postal Service?

MR. SCARLETT: No. I don't believe. I don't know at this time, because it's still early in the case, but let us assume, just for this, that it's unbeknownst to the Postal Service, but it came a time --

THE COURT: You're willing to assume that he was misrepresenting his agency to the Postal Service?

MR. SCARLETT: Correct.

THE COURT: Okay.

MR. SCARLETT: I'm trying to look at the facts, even though it's not summary judgment, from their point of view, but, at some point in time, the Postal Service did become aware of --

THE COURT: When was that?

MR. SCARLETT: I'll tell you exactly, Your Honor. May of 2004.

THE COURT: Okay.

MR. SCARLETT: Barry Burns --

THE COURT: What happened in May '04?

MR. SCARLETT: Barry Burns, one of the --

THE COURT: Who is he?

MR. SCARLETT: He is one of the Postal Service's international product managers. Informed the Plaintiff,

MR. SCARLETT: My understanding, it was a modification of the existing contract/license, so now American Mail Sort --

THE COURT: So does this create a new document?

MR. SCARLETT: No. It is -- okay.

(Pause.)

MR. SCARLETT: It's my understanding from my client, though I think he's kicking me in the shins, is that it's not a new license, but it's a license now titled in the name of American Mail Sort, LLC, as opposed to Distribution Postal Consultants, Inc.

THE COURT: Titled. Does that mean the Postal Service changes its record somehow so that it does not show them dealing with you; it shows them dealing with AMS?

MR. SCARLETT: Correct.

THE COURT: Okay. Go ahead.

MR. SCARLETT: The first problem is it's being done based upon what we consider fraudulent -- well, misrepresentations. The second problem is, even if it wasn't being done on misrepresentation, if you looked at American Mail Sort, it didn't qualify to receive such a license under the Postal Service's own regulations, Your Honor.

THE COURT: When I hear a lawyer say, "even if it wasn't," that tells me that there are probably some facts that suggest at least that there wasn't the fraudulent transfer

that you're talking about.

MR. SCARLETT: No. I mean, Mr. Dunbebin was out there behind our backs making representations and trying to steal our company's business. That's why we brought suit against him, and that's why his company is no longer in existence, Your Honor.

THE COURT: And you're saying they were not qualified because they couldn't guarantee the $25 million per year in usage; is that correct?

MR. SCARLETT: No, Your Honor. Under Section 623.2.a, which is set forth in Mr. Olson's letter, one of the regulations governing this type of international mail license, okay, the company must have a minimum of one year experience as an international or domestic mail consolidator, presorter or letter shop, and, at that particular time, it was my understanding that American Mail Sort did not qualify under those standards.

THE COURT: Although they had been in business with you from 2002 to 2004?

MR. SCARLETT: They didn't have this type of experience, Your Honor. They did not present that experience, and they did not follow the regulations on how to go about obtaining a new license. It's my understanding specifically from my client that, if American Mail Sort had, under these regulations, made a fresh application for this type of

about what the implications were for the Postal Service and how we ought to proceed given the apparent ongoing investigation by the Postal Inspection Service.

Q. Did you terminate at that time the license?

A. It was soon after that, I believe.

Q. Okay.

MR. SCARLETT: I have no further questions, Your Honor. Thank you.

THE COURT: Okay.

MS. DeSHIELDS: No redirect, Your Honor.

THE COURT: Thank you. You may step down.

(Witness excused.)

THE COURT: Any further evidence from the Government?

MR. SCARLETT: No, Your Honor. Thank you.

THE COURT: Any further evidence from the Government?

MS. DeSHIELDS: He said the Government.

MR. SCARLETT: Oh! I'm sorry.

MS. DeSHIELDS: No, Your Honor.

THE COURT: That sometimes works.

Okay. I'll hear your arguments now.

MR. SCARLETT: Your Honor, I think what we have to do is focus on the argument as to what we are here today. We are here for a preliminary injunction or temporary restraining

order to try to keep the status quo, four elements of that, and I think the primary element that I would argue, Your Honor, is the balancing test associated with the hardship. We have testimony that has been presented by Mr. Haber that basically we're talking about a company that's been around for 20-some years that will go out of business. We have testimony from Mr. Haber that says, in this legal case, that part of the reasons could be attributed to -- for the amount that is due could be attributed to the misactions of the Postal Service. We haven't had a proper hearing as to --

THE COURT: I guess I haven't heard that very clearly. I haven't heard that evidence.

MR. SCARLETT: Well, I believe --

THE COURT: It sounds to me that, in the most charitable way, from what I've heard, both of the parties were duped by AMS, to put it fairly.

MR. SCARLETT: Your Honor --

THE COURT: You're not suggesting the Post Office was acting in some sort of unlawful concert with Mr. Dunbebin, are you?

MR. SCARLETT: No, I'm not. Absolutely not. In fact, once again, I go back to where I started off --

THE COURT: As a matter of fact, your client introduced him to the Post Office and vouched for him by making him their agent, so certainly you're not suggesting any

harm or any fault on the part of the Post Office? You've both been defrauded essentially.

MR. SCARLETT: That's correct, Your Honor. The fact is, trying --

THE COURT: Just trying to get our terms clear. Just to get our terms clear on this issue.

MR. SCARLETT: I'm trying to dance on the head of a pin. I've been trying to figure out how to do this and also maintain a good relationship with the Post Office also long-term.

THE COURT: Well, acknowledge the simple fact that they're not bad guys here. You've both been taken by someone who appears to have been perhaps not the most honest of persons.

MR. SCARLETT: That is an accurate observation, but we get back to the balancing of the harm, Your Honor, and the maintaining of the status quo while a dispute as to the amount that is owed continues in this Court.

THE COURT: Beyond the bonding requirement -- and, if I do grant injunctive relief, I will require a bond -- how would I permit you to operate yet not get deeper into the Post Office's pocket?

MR. SCARLETT: I think that could be done --

THE COURT: Can you monitor receipts some way so that you would segregate a portion of your revenues directly

WORD INDEX

enough to be able to say one way or the other.

THE COURT: There is probably a whole body of Government contract law out there somewhere.

MR. SCARLETT: Your Honor, I've tried to be honest and straightforward with this Court, as always, but I am also not a Government contract specialist. I am the general counsel of Distribution Postal and proud of it.

THE COURT: Ms. DeShields?

MS. DeSHIELDS: Yes, Your Honor.

THE COURT: Applying, as I must, Blackwelder, which requires that I look at a balancing of the hardships, and instructs me that, if the balance decidedly favors one party, you know, like a small business operation versus the United States Government, there is a declining significance of the success on the merits, as long as serious questions are raised, as I understand the case, as I said, both parties are essentially victims of a fraud, admittedly by a fraud who was introduced to the Government by Mr. Haber's own vouching, but still essentially two innocent parties.

Why not set in some reasonable period of injunctive relief -- that is, continuation of this relationship -- with the requirement for posting a substantial bond and some sort of escrow mechanism for payment to the Post Office during the course of this period, whatever it is -- say, six months or so -- during which time the Government would have sufficient

for the Postal Service.

THE COURT: But I'm not talking about canceling the debt, whatever it is. I'm talking about bonding the debt, and also constructing essentially an escrow mechanism that, perhaps while not totalling shielding the Postal Service, would at least provide them some share in Mr. Haber's revenue stream.

MS. DeSHIELDS: But then what's the protection that's offered to the Postal Service if his revenue stream suddenly dries up because he's unable, you know, to meet the projections, you know, that he threw out before Your Honor?

THE COURT: Well, at that point, you have, say, six months of experience in which you point out to me that I was wrong, and I would certainly be willing to confess I was wrong. Okay. Let's decapitate the baby at this point.

MS. DeSHIELDS: All right, Your Honor. Well --

THE COURT: I would assume also that, you know, during the interim, as I said, you would be doing your usual litigation and would at that point either show me that he has no entitlement to relief by way of motions, in which case I again stop your bleeding by granting your motion. So, again, I recognize the Post Office is innocent here. I'm not saying anything bad about you. It's just, as between the two of you, there seems to be a decided imbalance in favor of the Plaintiff, but I'm not talking about a very long period of

irreparable injury is, in fact, met.

In this case, the balancing of hardships is somewhat complicated because, as I indicated, both parties are, it appears to the Court at this juncture, innocent, and that both parties may be fairly characterized as fraud victims. It is not as clear to me as to the Government that the case does not raise substantial questions. I believe that the effect of AMS' conduct on the Plaintiff's ability to meet its projections, which of course is something that has not been proved to be the fault of the Government, and the train of events that lead to not making the projections, again, establish the substantial nature of the questions at issue.

Accordingly, I will construct a mechanism that attempts to balance the interests of both parties while maintaining the status quo, and that I will grant a preliminary injunction for a period not to exceed six months from today's date. I will require the Plaintiff to post a bond, cash or corporate surety, in the amount of $226,571 within five days of today's date with the Registry of the Court. I will require the Plaintiffs to propose to the Court within a period of ten days from today's date a schedule for payments to the Government of a portion of the proceeds of postal sales, for want of a better expression, and the Government will have a period of four days to contest the proposed payment amounts and percentages.

That, folks, is the relief. I will, of course, reserve the right to polish that off-the-top-of-my-head Order to make it at least grammatical, if not logical. Okay?

MR. SCARLETT: Thank you very much, Your Honor.

THE COURT: Very good.

MS. DeSHIELDS: Thank you, Your Honor.

THE COURT: And I'm sure Judge Bennett will contact you with respect to future scheduling in the matter --

MR. SCARLETT: Thank you, Your Honor.

THE COURT: -- unless he convinces me that I should keep this myself. Okay. We're in recess.

THE CLERK: Please rise.

THE COURT: Thank you.

THE CLERK: This Honorable Court stands in recess.

(Proceedings adjourned.)

I, Martin J. Giordano, Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Martin J. Giordano 4-12-07

Martin J. Giordano, RMR, CRR Date

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

DISTRIBUTION POSTAL CONSULTANTS, INC., Civil No. RDB-07-0200

Plaintiff, Baltimore, Maryland

v. June 4, 2007

USPS, 10:00 a.m.

Defendant.

------------------------------------------------------/

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: Scarlett and Croll PA
By: ROBERT B. SCARLETT, ESQ.
201 North Charles Street
Suite 600
Baltimore, Maryland 21201

For the Defendant: United States Attorney's Office
By: ARIANA ARNOLD, ESQUIRE
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201

Court Reporter Lisa K. Bankins RMR
101 West Lombard Street
Room 5012
Baltimore, Maryland 21201

Proceedings recorded by mechanical stenography, transcript produced by notereading.

PROCEEDINGS

THE COURT: Madam Clerk, if you'll call the case, please?

THE CLERK: The matter now pending before this Court is Civil Action Number RDB-07-0200, Distribution Postal Consultants, Inc. v. United States Postal Service. Counsel for the plaintiff is Robert Scarlett and counsel for the defendant is Ariana Arnold.

THE COURT: Good morning, everyone. Good morning, Mr. Scarlett and I see you have the vice president of your client, Distribution Postal Consultants, Inc., Louis Haber with you. Is that correct?

MR. SCARLETT: Mr. Haber is sitting right here, Your Honor.

THE COURT: Good morning, Mr. Haber. Nice to see you. And for the Government, Assistant U.S. Attorney Ariana Arnold. Nice to see you, Ms. Arnold. And you have with you I note, you've got Patrick O'Hearn, a law clerk. Is that correct? Nice to see you.

MS. ARNOLD: Started in our office this week, Your Honor.

THE COURT: You're clerking there this summer. Is that right? Well, that's fine. And Nicole Wynn, a lawyer with the United States Postal Service. Good afternoon, Ms. Wynn. Nice to see you. And James Crawford from the U.S. Postal Service. Nice

to see you as well, sir. And Lorine Martin, also an attorney with the United States Postal Service. The lawyers are welcome to come sit at the trial table if you'd like. You're certainly welcome to come right up and sit right there. You don't need to sit back. And, Mr. O'Hearn, I hope you enjoy your clerkship at the U.S. Attorney's Office. That's a wonderful summer program they have there.

We have pending before the Court are three motions. A motion to show cause why the preliminary injunction ordered by Judge Quarles on January 26, 2007 should not be vacated. That's paper number 11. Then there is a motion to dismiss on jurisdictional grounds, paper Number 15 and then there is a motion to amend the complaint. The plaintiff seeking leave to amend the complaint to add a cause of action for negligence which is paper number 22. I believe they are the three motions pending before the Court. Is that correct, Mr. Scarlett?

MR. SCARLETT: That's correct, Your Honor. And at some point in time, if you let me speak, I think we can probably truncate this.

THE COURT: All right. That's fine. I'm just trying to summarize where we are. Ms. Arnold, is that correct from the Government's point of view?

MS. ARNOLD: Yes, Your Honor.

THE COURT: All right. Then the last housekeeping matter before I hear from counsel is I think I previously

it and transfer it is the point.

MS. ARNOLD: Correct. To the extent that it's seeking to allege a tort claim because the way his complaint is read, it seems to imply he's alleging a common law tort.

THE COURT: Well, I'm looking at the Count 1, breach of contract claim and it just sets out straight language that international mail license represents a contractual agreement between the plaintiff and the defendant and it alleges that the defendant breached it when it improperly transferred the mail license and as a result of the breach of contract, plaintiff has experienced monetary harm. It seems to set forth a straight contractual claim. So I'm not sure if I understand what the basis of your seeking to have me dismiss it is.

MS. ARNOLD: And again because the complaint doesn't specify, to the extent that the complaint would rely for a jurisdictional basis which is stated at the beginning of his, the jurisdiction he's alleging is stated at the beginning, to the extent that he's relying on the FTCA, our argument would be the FTCA doesn't permit that.

THE COURT: Well, I understand that. But my point is this. As opposed to -- there are choices between the Court just to dismiss it and then to require the defendant, the defendant is out of court on this matter for various points because the Court doesn't have jurisdiction or both counsel seem to be suggesting that I issue a transfer order to the Court of Claims which is I'm

certainly willing to entertain that. But I can't dismiss a count and then transfer. So I guess the Government's position is either one or the other. Is the Government seeking to have me dismiss it on lack of jurisdictional grounds or is the Government willing to have, does the Government agree that this matter can be transferred to the Court of Claims with respect to a breach of contract count?

MS. ARNOLD: We made those two arguments in the alternative, Your Honor.

THE COURT: I understand. I understand.

MS. ARNOLD: That if the Court is planning to transfer, Count 1 can be preserved because the Court of Claims does have jurisdiction.

THE COURT: Yes. I understand.

MS. ARNOLD: If the claim were to remain here, the only jurisdiction that Your Honor would have would have to be based on the FTCA.

THE COURT: I understand. I understand. Well, what is the Government's position? Is the Government opposing the transfer?

MS. ARNOLD: No.

THE COURT: All right. Okay.

MS. ARNOLD: So to the extent that Your Honor would want to preserve Count 1 and transfer the case, we would have no objection to that.

THE COURT: It seems, I guess just so and I know counsel for the United States Postal Service are here. I guess the point is it seems that it would be a waste of everyone's time and effort to then have this cause of action then be refiled in the Court of Claims unless there are limitations issues or other issues that I arise. I don't know that there are. But I want to make sure I'm clear. The Government's position is on Count 1, you have moved with respect to lack of jurisdiction of this court, but you have noted that alternatively you do not oppose the Court just issuing a transfer order transferring this to the Court of Claims and I guess that's what I'm trying to make sure we're clear on.

MS. ARNOLD: Correct, Your Honor. With respect to Count 1 only.

THE COURT: I understand. Just as to Count 1. I'm just going step by step. All right. Is that correct from the point of view of -- you want to talk to counsel for a minute? You're certainly welcome to, your co-counsel from the United States Postal Service.

(Counsel conferred.)

MS. ARNOLD: Your Honor, counsel just wanted to clarify and I assured them under the rules of court that they would still be permitted to challenge the breach of contract claim --

THE COURT: Certainly.

MS. ARNOLD: -- in the court.

THE COURT: Certainly. There's no acknowledgement on the merits. It's just that the Court of Claims would have jurisdiction over it --

MS. ARNOLD: Because the only arguments we've made thus far are --

THE COURT: I understand. Now with respect to Count 2, implied covenants of good faith and fair dealing, your motion on that is that that cause of action doesn't lie in any way, shape or form. It's essentially a tort action of some sort. Correct?

MS. ARNOLD: Right. And under Maryland law, that can only be -- under the FTCA, that could only arise if one were to --

THE COURT: Right. Within the six-month period. Right.

MS. ARNOLD: Right.

THE COURT: And then the Count 3, the Government's motion is is that I've already vacated the preliminary injunction, temporary restraining order.

MS. ARNOLD: Correct.

THE COURT: So the position of the Government is is that Counts 2 and 3 should be dismissed. Count 1 should be transferred to the Court of Claims. And this case should go to the Court of Claims.

MS. ARNOLD: Correct. And then as to the motion to amend, Your Honor, our position as stated in our opposition to

the motion is basically two-fold. The first is that we think there's a limitations problem. And that under the case law, we don't believe that it can relate back to the filing of the complaint under these circumstances. And the second is that under Maryland law, this kind of action cannot as a matter of law be based in negligence. And that argument, Your Honor, we would respectfully argue is appropriate for Your Honor to decide rather than transferring that issue meaning transferring the case before deciding on ruling on the motion to amend.

THE COURT: Yes.

MS. ARNOLD: A, because I think Your Honor is going to be more familiar with Maryland law than with the Court of Claims and, B, because that issue has been fully briefed and goes to the characterization of the claim and since again we believe that the crux and the only basis for this claim lies in the contract of itself, we don't believe that the plaintiff has accurately or adequately stated a claim for negligence. As a side bar/footnote, Your Honor, we have noted that the only, even if that were not the case, the only proper defendant in a case under the FTCA as Your Honor is aware is the United States.

THE COURT: Yes.

MS. ARNOLD: So to the extent that that claim were added, the proper defendant for it would be the United States and not the postal service.

THE COURT: All right. Thank you, Ms. Arnold.

Mr. Scarlett, let's go right to the core of this if we can quickly and save time on this. Count 1 is a breach of contract claim.

MR. SCARLETT: Pure breach of contract claim --

THE COURT: Pure breach of contract claim. Count 2 is implied covenants of good faith and fair dealing, essentially a tort claim. Correct?

MR. SCARLETT: Correct.

THE COURT: And Count 3, I've already essentially vacated the preliminary injunction. With respect to your motion to amend, we can address that first. But I want to make sure I'm clear what your position is is that -- before I rule on Counts 2 and 3 and the matter of Count 1, we'll address the matter of your motion to amend or perhaps we may not need to address it. I don't know what your position on that is. Are you prepared to just proceed on the breach of contract claim in the Court of Claims without amending?

MR. SCARLETT: That's not my suggestion to the Court, Your Honor. So the answer is no.

THE COURT: All right. Okay. Well, let me hear you then on the motion to amend first.

MR. SCARLETT: The motion to amend under Rule 15, Your Honor, is generally done on a liberal basis at this particular court. But with that said, I think that if this case is going to be transferred to the Federal Court of Claims, that quite

straight contractual claim it seems to this Court is somewhat contorted. And for those reasons, the motion to amend is denied.

Now with respect to the motion to dismiss the complaint, paper number 15, we still have the issue of Counts 2 and 3. I have vacated the preliminary injunction. There is still pending the matter of the motion to dismiss and for the reasons that follow, it will be denied in part and granted in part. It will be granted with respect to Counts 2 and 3. With respect specifically as to Count 2 the implied covenants of good faith and fair dealing, the motion to dismiss is granted in that that essentially amounts to a tort claim. It's trying to take a contractual claim and create a tort claim out of it. Count 3, I've already vacated the preliminary injunction and the temporary restraining order. Counts 2 and 3 are dismissed pursuant to Government motion, paper number 15, for the reasons I've previously indicated with respect to the nature of a tort action here. Under the jurisdictional rules of this court under what is known as the Big Tucker Act, the Court of Claims, the Court of Federal Claims has exclusive jurisdiction over claims for money damages that exceed $10,000 and so there is no jurisdiction of this Court with respect to the contractual claim. Essentially, I've dealt with the injunctive, request for injunctive relief. As to the matter of seeking to couch this in terms of a tort, there is simply no tort that can be structured out of the straight contractual claim brought by the plaintiff and

specifically, I would note that the United States Postal Services regulations do not give rise to tort duties as sought by the plaintiff in Count 2 as well as in the amended complaint. Maryland law does not recognize a tort action for merely economic loss unless there's been some risk of personal injury. I would note Lloyd v. General Motors Corp., 916 Atlantic Section 257. There is no specific private right of action to enforce United States Postal Services regulations and there I would note Concept Automation v. United States Postal Service, 887 F.Sup. 6, District Court of the District of Columbia. So for those reasons, Counts 2 and 3 are dismissed. The motion to dismiss paper number 15 is denied in part with respect to Count 1. There there is a straight cause of action in contract that can certainly have been filed in the court of claims under the Big Tucker Act as I've noted and pursuant to the provisions of 28 United States Code, Section 1631, this Court may find that there is a want of jurisdiction as to Count 1 which I do so find. But I shall in the interest of justice transfer that cause of action to another court and do not, I'm not going to require the plaintiff to refile this action. So an appropriate order will be prepared pursuant to which, for the reasons stated on the record here in court. Paper number 11, the motion to show cause, is granted. Paper number 22 is denied. Paper number 15, the motion to dismiss, is granted in part and denied in part. It is granted as to Counts 2 and 3. It is denied as to Count 1. And I will

enter an order transferring this one count cause of action to the Federal Court of Claims. Anything further from the point of view of the plaintiff, Mr. Scarlett?

MR. SCARLETT: No, Your Honor. It's a pleasure --

THE COURT: It's nice to see you again as always.

MR. SCARLETT: -- in front of you the first time.

THE COURT: And Ms. Arnold, anything further from the point of view of the Government?

MS. ARNOLD: No. Thank you, Your Honor.

THE COURT: Nice to see all of you and I think this will tighten this case up and we'll see to it that it gets -- and I think it's in fairness to Mr. Haber's company that this cause of action still remains filed. You still have a cause of action against the Government, Mr. Haber, and we're transferring this to the appropriate court and I'll issue an appropriate order and I'll get that filed today. So it's nice to see all of you.

(Proceedings concluded.)

I, LISA K. BANKINS, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

________________________________ __________
Signature of Court Reporter/ Transcriber Date

________________________________
Typed or Printed Name

# EXHIBIT 10

UNITED STATES
POSTAL SERVICE

May 11, 2005

William J. Olson
6180 Greensboro Drive
Suite 1070
McLean, VA 22102-3860

SUBJECT: Distribution Postal Company, Inc., International Customized Mail Agreement

Dear Mr. Olson:

This replies to your letter of March 21 concerning Distribution Postal Company, Inc. (DPC). In your letter, you refer to an October 11, 2004, letter from James B. Kraft, Esq., in which Mr. Kraft brought to our attention DPC's objections to the conduct of another international mailing company, American Mail Sort, LLC (AMS) and requested that the Postal Service investigate. The Postal Service responded to Mr. Kraft's letter on October 20, 2004, and stated, in summary, that it had investigated the circumstances raised in Mr. Kraft's letter and concluded that no action on the Postal Service's part was warranted.

Your letter states that DPC was, and is, a Postal Qualified Wholesaler and has an International Customized Mail agreement (ICM) with the Postal Service that gives it discounted rates based on the amount of postage paid to the Postal Service over a one-year period. The amount of the discount is based on DPC's commitment to a minimum postage that it will pay to the Postal Service during the year. In the event that the minimum postage is not paid, the amount of discount is reduced according to a schedule of discounts related to different minimum postage levels. DPC is required to pay to the Postal Service the difference between the discount that would have applied if the minimum postage had been achieved and the discount to which DPC was entitled according to the amount of postage actually paid. Your letter further states that due to events that occurred in 2002, DPC is facing an obstacle in achieving the minimum postage to which DPC committed in its current ICM agreement. You ask that the Postal Service waive the minimum postage requirement for the first year of the current ICM agreement and extend the expiration of the current agreement from December 31, 2005, to August 13, 2006. Under this proposal, DPC would have from August 14, 2004, to August 13, 2006, a two-year period, in which to tender the Postal Service the $25 million in postage commitment represented in the agreement. Alternatively, DPC and the Postal Service would agree to terminate the current ICM agreement without penalty, and enter into a new a new ICM agreement that would allow DPC to meet the $25 million minimum commitment in the one year period of the new agreement. For the reasons given below, we cannot agree to your proposals.

The facts of this case, as we understand them, are as follows. In April 2002, Robert Dunbebin, whom the Postal Service understood to be the authorized representative of DPC, undertook to negotiate an ICM with the Postal Service, which agreement was signed by Mr. Dunbebin on behalf of DPC on April 24, 2002. In May 2002, Mr. Dunbebin advised the Postal Service that DPC wished to discontinue the agreement that had been signed in April and that the traffic represented in that agreement would be taken over by AMS. On May 30, Mr. Dunbebin, again on

behalf of DPC, signed an amendment of the April 24 agreement, which had the effect of terminating that agreement by the mutual consent of the parties. After that date, and until a new ICM agreement was entered into between DPC and the Postal Service on August 14, 2004, DPC did not tender any international mail directly to the Postal Service.

The Postal Service is aware that there are a number of international mail consolidators and that the business relationships between these consolidators change from time to time. It would not be unusual for one consolidator to handle volumes for another consolidator, and, for the most part, the Postal Service would not be aware of what the relationship between the consolidators, or between the consolidators and their customers, would be. In this instance, a person who appeared to be the authorized representative of DPC both signed an ICM agreement and signed the amendment terminating it. The Postal Service had no reason to doubt that authority at the time, and subsequent events, in particular the absence of any volumes coming directly from DPC in the ensuing two years, gave it no reason to believe that anything improper had occurred. Even today, your letter does not question Mr. Dunbebin's authority to enter into the April 24 ICM agreement on behalf of DPC. If he did not have that authority, there would have been no need to terminate the April 24 agreement. Nor does your letter provide any evidence that Mr. Dunbebin did not have authority to act on behalf of DPC on May 30, 2002, when the termination amendment was signed.

Under these circumstances, we can only conclude that there is a business dispute between DPC and AMS. We are not privy to what relationship, if any, existed between those two companies, or what circumstances have led to the apparent present dispute. In recognition of DPC's long presence in the international mail market, the Postal Service had no hesitation in entering into a new ICM agreement with DPC when DPC requested it. However, the Postal Service is obliged to treat all of its customers without preference or discrimination. It cannot apply one set of conditions for rate eligibility to one customer, and apply a different set to a similarly situated customer.

With respect to your first proposal, that DPC be allowed two years to meet its $25 million minimum commitment, to do so would be to grant DPC conditions of eligibility for rate discounts more favorable than the conditions applied to other similarly situated customers. That would also be the case with your second proposal, which would effectively waive minimum postage requirements for rate discount eligibility for the period between August 14, 2004, and the effective date of the termination. To do what you ask, the Postal Service would have to offer the same conditions to all similarly situated customers, and that would not be possible.

Sincerely,

Michael K. Plunkett
Manager
Pricing Strategy

cc: Ms. Bizzotto
Mr. Kearney
Mr. Whalen
Mr. Alvis
Mr. Haber, Sr.
Mr. Mastervich