# In the United States Court of Federal Claims

No. 08-17C
(Filed: December 7, 2009)

* * * * * * * * * * * * * * * * * * * *

DISTRIBUTION POSTAL
CONSULANTS, INC.,

                *Plaintiff*,

v.

THE UNITED STATES,

                *Defendant.*

* * * * * * * * * * * * * * * * * * * *

Apparent Authority;
Breach of Contract.

*Robert B. Scarlett*, *Michael S. Myers*, Baltimore, MD, for plaintiff.

*Matthew H. Solomson*, Trial Attorney, Civil Division, Department of Justice, Washington, DC, *Michael F. Hertz*, Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    Distribution Postal Consultants, Inc. ("plaintiff" or "DPC") filed this breach of contract action against the United States Postal Service ("defendant" or "USPS"), on January 16, 2008. DPC had a series of three contracts, known as International Customized Mail (ICM) agreements, with the USPS. These permitted it to obtain discounts on international bulk mailing, which DPC then

1

passed on to its customers. DPC contends that the USPS breached its first ICM by terminating it early, prompted by a fraud perpetrated by a third party. Defendant counterclaims for deficiencies allegedly owed the USPS on the two subsequent ICMs.

On August 17, 2009, we denied the parties' cross-motions for summary judgment, concluding that there were triable issues. On November 30, 2009, we conducted trial in Washington, DC, limited to the issue of liability on both the claim and counterclaim. The court identified the following issues for trial: (1) Whether the factual circumstances at issue here prompted a duty on the part of the USPS to inquire as to the authority of Mr. Dunbebin to act on behalf of plaintiff; (2) Whether defendant's alleged breach of contract caused injury-in-fact to plaintiff; and (3) Whether there is a causal connection between defendant's alleged breach of contract as to the first ICM agreement and plaintiff's failure to perform the second and third ICMs.

## FACTS[1]

Two witnesses appeared at trial. The first was Mr. Lewis Haber, Sr. He has a long career as a mail consolidator. Mr. Haber formed DPC in 1986. It is a small business that produces and manages both domestic and international mail services for its customers. DPC has entered into a number of ICM agreements with USPS. These ICM agreements allow DPC to purchase postage from USPS at a tiered discounted rate. DPC would then sell the postage between the discounted rate and the full rate to bulk shippers in exchange for an agreement by DPC to sell a certain minimum quantity of postage annually.

The second witness was James Crawford, a longtime USPS employee, whose current position is Business Development Specialist. He has managed the ICM agreement program for ten years.

Prior to 2002, when it obtained its first ICM, DPC, in addition to its own domestic mail consolidating services, was a "feeder" to other companies which had their own ICM agreements. As Mr. Haber explained, because the USPS sets a high number for the minimum volume of mail needed to obtain the maximum discount of 16%, companies with an ICM agreement often

---

[1] The parties entered into an extensive stipulation of facts. Other fact findings are based on the trial presentations.

2

depend on such feeder companies to add to the volume routed through their ICMs.

Mr. Haber was acquainted with Mr. Robert Dunbebin, another individual with extensive experience in the business of mail consolidation. Prior to 2002, Mr. Dunbebin worked for Priority Postal, another consolidator.[2] He and Mr. Haber met, between January and April 2002, and discussed the advantages of DPC obtaining an ICM agreement on its own account in the competitive market for international bulk mail services. Mr. Haber and Mr. Dunbebin entered into an oral agreement with respect to distribution of profits, should they develop. That agreement was oral because of Mr. Haber's concerns about a possible non-compete obligation Mr. Dunbebin owed Priority Postal.[3] The expectation was that Mr. Dunbebin would use his extensive contacts with customers to generate a large volume of mail which could be credited to DPC's account. Mr. Haber calculated that DPC would probably not make the minimum volume in the first year, but that thereafter, in the out years of an ICM agreement, it would.

DPC had a very informal corporate structure in which no one held official titles. Mr. Haber was its principal and viewed himself as president. There were no other official positions. Nevertheless, he authorized Mr. Dunbebin, who was not an employee, to go on April 24, 2002, to USPS's office in Virginia to sign the original ICM as a "vice president," even though he did not hold that title. Mr. John Alepa executed the agreement on behalf of USPS. DPC does not question defendant's assertion that Dunbebin was its authorized agent for purposes of entering into the agreement, and that it did not notify anyone at USPS that Dunbebin's authority was limited until much later.[4] Under that agreement, DPC committed to sell a minimum of $25

---

[2]Prior to receiving its own ICM agreement, DPC mailed its customers' international mail through a "link" with an ICM agreement held by Priority Post.

[3]Because of their prior acquaintanceship, Mr. Haber performed no background check on Mr. Dunbebin, nor did he ask Dunbebin to provide any references.

[4]The parties stipulate that, prior to April 24, 2002, Mr. Haber, spoke with a USPS representative and indicated that DPC and Mr. Dunbebin were working together in the mail consolidation business.

3

million of postage annually in exchange for a discount of 16% on all USPS postage purchases made. The ICM was originally scheduled to be in effect from April 26, 2002, to April 30, 2005.

All notices in conjunction with the ICM were to be sent to DPC at 7914 East Baltimore Street, Baltimore, Maryland. The significance of that address is that it was not DPC's principal place of business. It was a remote facility in which Mr. Dunbebin operated. Mr. Haber saw and read portions of the first ICM, but did not notice that the address designated for official notices was the Baltimore Street address. No one from DPC questioned any terms of the agreement.

Shortly thereafter, Mr. Dunbebin formed his own mail company, American Mail Sort, LLC ("AMS"). Mr. Haber knew in May 2002 that Mr. Dunbebin had incorporated AMS and that he operated AMS out of DPC's facilities.

In May, Mr. Dunbebin telephoned Mr. Crawford and explained that, for reasons internal to DPC, it wished to transfer the ICM to a separate corporation, AMS. He subsequently, with an email and attached letter, confirmed this request.

Mr. Crawford testified that he consulted lawyers within USPS, who suggested that, rather than transfer the ICM to a different corporation, the first ICM should be terminated and a new one executed. Unbeknownst to Mr. Haber, on May 30, 2002, that is what occurred. Mr. Dunbebin executed an amendment to the original ICM, signing as "vice president." This had the effect of immediately terminating DPC's ICM. The same day, Mr. Alepa issued an ICM to AMS, whose office was located at 7914 East Baltimore Street, Baltimore, Maryland. Mr. Dunbebin signed the ICM on behalf of AMS as the company's president. Mr. Crawford, who arranged the termination as well as the execution of a new agreement, testified that he assumed that Dunbebin had the authority to terminate as well as execute ICM's on behalf of DCM. No mail had been tendered to the Postal Service under DPC's ICM agreement between April 24, 2002, and May 30, 2002.

Mr. Haber testified that the software necessary to credit bulk mailing to DPC's ICM account was not operational until fall 2003. He therefore assumed that no mail would have been moving through DPC's facilities pursuant to the ICM until that time. Even after the software was operational,

he never asked Mr. Dunbebin for an accounting of the volumes of mail being credited to DPC's (non-existent) ICM. He assumed that it would take at least a year to build up the required volumes and hence was not particularly concerned about numbers.

The parties stipulate that DPC first became aware in late 2003 that Mr. Dunbebin and the Postal Service had terminated DPC's ICM agreement effective on May 30, 2002. DPC did not object for ten months from the time it first learned that it did not have an active ICM agreement. DPC also did not immediately ask the Postal Service to execute a new ICM with DPC, even though DPC thought it was eligible for a new ICM agreement and had no reason to believe that the Postal Service would have refused such a request. USPS had received no shipping volume from DPC from May 2002 to May 2004. USPS credited AMS' ICM account for all mail processed at 7914 East Baltimore Street during that time.

DPC, through Mr. Haber, entered into a second ICM agreement with USPS, effective from August 14, 2004 until December 31, 2005. Similar to the provisions of the original ICM, the second ICM allowed DPC to receive a 16% purchase price discount from USPS in exchange for an agreement that DPC would generate at least $25 million in postage sales during the ICM term.

In October 2004, DPC filed suit against Mr. Dunbebin and AMS for fraudulent misappropriation of the first ICM in the Baltimore City circuit court ("circuit court"). See *DPC v. Dubebin* [sic], *et al.*, Case No. 4C-04-007557 (Cir. Ct. Balt. City 2004). Plaintiff received a default judgment from the circuit court for $755,197.31 in compensatory damages and $10,000,000.00 in punitive damages on December 12, 2005. It has not recovered on that judgment.

DPC, again through Mr. Haber, executed a third ICM agreement with USPS, effective from January 8, 2006, until December 31, 2006. DPC's third ICM contained the same contract terms as the prior two ICMs: namely, that DPC would produce at least $25 million in postage sales during the ICM term in exchange for a 16% discount in postage purchases.

A contract term present in each ICM agreement states that DPC will reimburse USPS for unearned postage discounts if does not sell the specified postage amount. DPC failed to meet the postage sales requirement of $25 million during both the second and third ICM terms. On October 16, 2006, USPS Accounting Service invoiced DPC for $136,571 for unearned postage

discounts related to its second ICM. USPS Accounting Service invoiced DPC $98,028 on July 21, 2008, for unearned postage discounts related to its third ICM. DPC has not paid either invoice.

## DISCUSSION

*I. Plaintiff's Claim*

DPC makes only one claim: breach of contract. It contends that the undisputed facts show that USPS breached its contract with DPC when it allowed Mr. Dunbebin to terminate DPC's first ICM. Plaintiff contends that:

> The International Mail License represents a contractual agreement between the Plaintiff and the Defendant, which the Defendant breached when it improperly transferred the International Mail License to American Mail Sort and, also, after being duly informed of the improper transfer, allowed American Mail Sort to continue utilizing the International Mail License even though American Mail Sort did not qualify for such an international mail license under the Defendant's own criteria and regulations for issuing such a license. As a result of Defendant's breach of contract, Plaintiff has experienced monetary harm and was damaged.

Compl. at ¶¶ 35-36. DPC claims damages in the amount of $1,119,362.00, which it calculates to be the revenue lost on the first ICM agreement.

Defendant asserts that the USPS reasonably relied on Mr. Dunbebin's apparent authority to terminate DPC's first ICM agreement with USPS. It argues that, because DPC authorized Mr. Dunbebin to sign DPC's ICM in April 2002, as its vice president, at a minimum, he had apparent authority to sign the termination agreement of DPC's ICM one month later. Plaintiff counters that the USPS was obligated to verify his authority to cancel the first agreement. We agree with defendant.

An agency relationship occurs when a principal, "naturally possessing the power to act for herself, enlists the activity of an agent by communicating to the latter the power she is granting." *Brunner v. United States*, 70 Fed. Cl. 623, 627 (2006) (citing *Restatement (Second) of Agency* § 7 (1958)). When power is conferred by the principal upon the agent expressly, whether or not

6

in writing, this is referred to as actual authority. *Id*. at 628 (citing *Restatement (Second) of Agency* § 7 cmt. c (1958)).  Apparent authority, however, occurs when a principal makes others believe that she has conferred authority upon an agent by holding them out to the public or a third-party as the principal's agent.  *Id.* (citing *Restatement (Second) of Agency* § 8 cmt. a (1958)).  According to the *Restatement (Third) of Agency* § 3.03 cmt. b (2006), "third parties who interact with the principal through the agent will naturally and reasonably assume that the agent had authority to do acts consistent with the agent's position or role except when the third party has notice of facts suggesting that this may not be so."

Plaintiff concedes that it authorized Mr. Dunbebin to execute the original ICM agreement.  And it is undisputed that DPC did not inform USPS of any changes in Mr. Dunbebin's agency status prior to the termination of the first ICM agreement.

Plaintiff argues, however, that the novelty of Mr. Dunbebin wanting to cancel a three year contract after only thirty-six days should have put the USPS on notice to inquire about his authority to act on behalf of DPC.[5]  Plaintiff cites *Herbert Construction Co. v. Continental Insurance Co.*, 931 F.2d 989, 996 (2d Cir. 1991) and *Brunner*, 70 Fed. Cl. at 628, to support its argument that the extraordinary circumstances surrounding Mr. Dunbebin's termination of DPC's first ICM should have put USPS on notice of potential fraud.  According to *Brunner*, a third-party may generally rely on the apparent authority of an agent if a principal creates the impression of authority or acquiesces in the agent's statements.  70 Fed. Cl. at 628.  *Brunner* recognizes two exceptions to this general rule, however: (1) when "'circumstances indicate that the agent may be acting in fraud of the principal' . . ." and (2) when "the third party 'has notice that the agent's authority is created or described in a writing which is intended for his inspection.'"  *Id.* (internal citations omitted).

In *Herbert*, the court analyzed when recovery based on the doctrine of apparent authority is warranted and when the duty for a third party to inquire into potentially fraudulent activity arises.  "[T]he duty to inquire only arises when "the facts and circumstances are such as to put him on inquiry,' the

---

[5] Plaintiff points out that the terms of ICM agreement only permit cancellation with six months prior notice.  That provision plainly relates to a unilateral cancellation, however, not a joint termination.

7

transaction is "extraordinary" or the "novelty" of the transaction alerts the third party to the danger of fraud . . . ." *Herbert*, 931 F.2d at 996 (internal citations omitted).  According to plaintiff, the circumstances here were sufficiently unusual to put the USPS on notice of potential fraud.

Defendant responds that the USPS could not have been aware that Mr. Dunbebin had no authority to cancel the agreement.  Defendant cites *Brunner*'s general rule that "when a principal creates an appearance of an agent's authority expressly, or by holding out the agent (that is, by implication), no duty of inquiry falls on third parties to verify this authority." *Brunner*, 70 Fed. Cl. at 629.  According to defendant, the factual circumstances did not trigger a duty in the USPS to inquire further about Mr. Dunbebin's authority.

There a number of factors which confirm defendant's position.  Mr. Dunbebin signed DPC's original ICM agreement as DPC's vice president although he had never been formally given that title by DPC's management or put on DPC's payroll as an employee. Mr. Haber reviewed the original ICM after its execution by Mr. Dunbebin and did nothing to inform USPS of the document's errors with regard to Mr. Dunbebin's title and DPC's address. Mr. Haber never contested Mr. Dunbebin's signature on behalf of DPC as the company's vice president.  Mr. Dunbebin thus had actual authority to execute the contract.

What happened thereafter, at a minimum, means that Mr. Dunbebin had apparent authority to execute the termination.  Plaintiff has stipulated that the agency had received no indication from DPC, prior to terminating the original ICM, that Mr. Dunbebin was not authorized to terminate the agreement that he himself had entered into on behalf of DPC only a month prior.  The agency knew that American Mail Sort used the same mailing address that DPC had used in its ICM.  The identity of the two companies' addresses would have suggested to USPS that DPC itself was well aware of AMS and its activities, and that, as Mr. Dunbebin had told Mr. Crawford, the change was merely one for the convenience of DPC and its related entities.  Mr. Haber was aware that Mr. Dunbebin had incorporated his own mail company, AMS, in May 2002, and also knew that Mr. Dunbebin was operating his corporation out of DPC's Baltimore address.

The USPS had no reason to question the connection between Mr. Dunbebin and DPC because Mr. Haber had spoken with a Postal Service

representative and indicated that DPC and Mr. Dunbebin were working together in the mail consolidation business.  In the absence of a written delegation of authority, plaintiff is in a weak position to make the argument that the agency should have inquired further on Mr. Dunbebin's reappearance in May.  There is nothing in the circumstances surrounding the termination that would have put USPS on notice of Mr. Dunbebin's fraud. Given his actual authority to sign the agreement, we find that Mr. Dunbebin continued to have apparent authority to obligate DPC.  We conclude that USPS' dependence on Mr. Dunbebin's apparent authority to cancel the original ICM as an agent for DPC was reasonable.

Moreover, plaintiff was in a far better position to suspect something was amiss.  Plaintiff's software became operational in September, 2002. At that point it had reason to inquire about progress toward making the contract minimum volumes.  Mr. Haber testified, however, that he never asked for a printout of any figures.  Once DPC was informed in late 2003 about the fraud, it did nothing to block AMS' use of the ICM for ten months, during which AMS continued to use DPC's facilities.  Plaintiff took the risk of authorizing Mr. Dunbebin to act on its behalf and was in the best position to monitor his actions.  Its failure to do so does not entitle it to shift the consequences of its conduct to the government.  The government is entitled to judgment in its favor on plaintiff's claim.

*II. Defendant's Counterclaim*

On August 1, 2008, defendant filed its answer and counterclaim against DPC for breach of contract with respect to the second and third ICM agreements.  Mr. Haber executed both agreements the with USPS on behalf of DPC as DPC's President/CEO.  DPC contracted in both of the follow-on ICMs to sell $25 million in actual postage on an annualized basis in exchange for USPS' agreement to sell DPC postage at a 16% discount.  It is undisputed that plaintiff failed to process sufficient volumes of mail during both the second and third ICMs.

Plaintiff agreed in both the second and third ICMs to reimburse USPS for discounts received but not earned.  The reimbursement provision in the second ICM, effective August 14, 2004 to December 31, 2005, states:

> If the Mailer does not tender to the USPS mail . . . that generates
> at least $25 million in actual postage on an annualized basis . .

> . the Mailer must reimburse the USPS the amount of the additional discount it received for mailings above the discount earned subject to this Agreement . . . . Payment must be made no later than three (3) months after the end of the related period.

The reimbursement provision in the third ICM, effective January 8, 2006 to December 31, 2006, is to the same effect. The USPS calculates that DPC owes it $136,571 for unearned discounts received pursuant to its second ICM agreement, and $98,028 for unearned discounts received pursuant to the third ICM agreement—a total of $234,599.

DPC's only response is to blame the USPS for its inability to produce sufficient sales pursuant to the second and third ICM agreement terms. It contends that, but for the agency's negligent termination of the first ICM and its de facto assignment to AMS, it would have been able to make the required volumes. This defense obviously fails in light of our conclusion above that the agency bears no fault in the termination of DPC's first agreement.

In any event, DPC voluntarily entered into the second and third ICM agreements with full knowledge of the fraud. It therefore must be held to the contract terms. DPC breached the terms of its second and third ICM agreements with USPS and is liable for the contract damages. Because the parties understood that damages would not be at issue during the trial, the question of the amount of the government's recovery is deferred.

## CONCLUSION

Defendant is entitled to judgment on plaintiff's claim and its own counterclaim. The parties are directed to confer and attempt to agree on the amount of damages, assuming this ruling on liability is correct. They shall file a joint status report on or before December 18, 2009, indicating whether they were able to reach agreement. If they cannot reach agreement, the report will present the parties' positions with respect to how to resolve the government's damages.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge